[No. A084888. First Dist., Div. Three. Oct. 27, 1999.]

RUSSELL KEIMER, Plaintiff and Appellant, v.
BUENA VISTA BOOKS, INC., et al., Defendants Respondents.

## COUNSEL

Bayer, August & Belote, Andrew A. August, Timothy M. Flaherty; Lerman & Lerman and Jeffrey H. Lerman for Plaintiff and Appellant.

Carr, Mussman & Harvey, Timothy E. Carr and Ian K. Boyd for Defendants and Respondents Buena Vista Books, Inc., and Buena Vista Publishing Group, Inc.

Keesal, Young & Logan, Philip A. McLeod, Devin A. Donohue; Seidler & McErlean and William M. McErlean for Defendant and Respondent Central Picture Entertainment, Inc.

Weil, Gotshal & Manages and Jared Bobrow for the Association of American Publishers, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**WALKER, J.**—In this appeal we decide a narrow question: Does the First Amendment protect advertising statements made on book and videotape covers which reiterate verifiably false factual statements contained in the books and videotape themselves? Appellant Russell Keimer sued on behalf of the general public, contending that publishers' advertisements on those covers, trumpeting falsely inflated investment returns by the now infamous Beardstown Ladies Investment Club, violated California's false advertising and unfair business practice laws.[1] The publishers/producers of the books and videotape, respondents on appeal,[2] demurred to Keimer's complaint, claiming that he could not state a cause of action because the statements to which he objected were noncommercial speech protected by the First Amendment of the United States Constitution and California's constitutional free speech provisions. The trial court sustained the demurrers without leave to amend; Keimer appeals.

We hold that the complaint stated causes of action for false advertising and unfair business practice and that the advertising, alleged in the complaint to be false, was commercial speech which was not, in the context presented, protected by the First Amendment. In so holding we reiterate California's legitimate right to protect the public by regulating the dissemination of false or misleading advertising, and again recognize the broad sweep of the false advertising and unfair business practice provisions of the Business and Professions Code. We reverse.

### I. Facts[3]

In 1983 a group of retired women from Beardstown, Illinois, formed a financial investment club which came to national attention in 1991 because

---

[1]Business and Professions Code sections 17200 et seq. and 17500 et seq. Unless otherwise specified, all statutory references will be to this code.

[2]In his complaint, Keimer sued Hyperion Press, Ltd., The Disney Publishing Group, Inc., Seth Godin Productions, Inc., and Central Picture Entertainment, Inc. He later learned that Hyperion Press was doing business as Buena Vista Books, Inc., and that The Disney Publishing Group had changed its name to Buena Vista Publishing Group, Inc. Because the Buena Vista entities are subsidiaries or affiliates of The Walt Disney Company, and Buena Vista has taken the lead in pleading in the trial court and here, both sides often refer to all respondents collectively as Disney, we shall do likewise.

[3]The facts are gleaned from the allegations of the complaint, which we accept as true for purposes of reviewing the trial court's ruling on demurrer (*Day* v. *AT & T Corp.* (1998) 63 Cal.App.4th 325, 335 [74 Cal.Rptr.2d 55]) and from those matters properly judicially noticed and conceded by both sides.

of its claimed 10-year-average annual investment return of 23.4 percent, a return higher than the Standard and Poors Index, and 3 times higher than that obtained by mutual funds and professional money managers during the same period. News of the women who became known as "The Beardstown Ladies" and their financial investment savvy spread to television, then to a videotape produced by respondent Central Picture Entertainment, Inc., entitled Cookin' Up Profits on Wall Street—A Guide to Common Sense Investing. Eventually respondent Seth Godin Productions acquired the rights to The Beardstown Ladies' story and developed a ghost-written book for them, which it sold to Hyperion Press, the Disney-owned publisher. Disney titled the book, The Beardstown Ladies' Common-Sense Investment Guide —How We Beat the Stock Market—and How You Can, Too which was first published in hardcover, and later in paperback. Four other books, entitled The Beardstown Ladies' Stitch-in-Time Guide to Growing Your Nest Egg; The Beardstown Ladies' Guide to Smart Spending for Big Savings; The Beardstown Ladies' Little Book of Investment Wisdom; The Beardstown Ladies' Pocketbook Guide to Picking Stocks; and a video entitled The Beardstown Ladies—Cookin' Up Profits on Wall Street—A Guide to Common Sense Investing followed. Displayed prominently on the front and back covers and the packaging of these materials there often appeared statements such as "23.4% ANNUAL RETURN"; "59.5% returns in 1991"; "find [the Beardstown Ladies'] secret recipe for success"; and "learn how to outperform mutual funds and professional money managers 3 to 1."

Keimer's complaint alleged that these statements, extolling The Beardstown Ladies' annual rate of return and investment success record as compared with investment industry professionals, were used by respondents as the primary basis for advertising and marketing the books and videotape to the general public. The complaint further alleged that these statements were false and misleading, because the verifiable fact was that the investment club's actual average rate of return from 1984 to 1994 was 9.1 percent as opposed to the advertised 23.4 percent, and did not outperform mutual funds and investment professionals by a ratio of three to one. As such, Keimer claimed that Disney had engaged in false advertising and unfair business practices because it knew or should have known that the advertising claims were false, misleading and/or likely to deceive the public.

The complaint's allegations were supplemented by the books and videotape themselves, of which Disney asked the trial court to take judicial notice, a request which received no opposition from Keimer.[4] The judicially noticed materials substantiated the complaint's allegations regarding the text of

---

[4]Although the record does not indicate the trial court's ruling on the judicial notice request, it appears clear that it did take notice of the books and videotapes. Had it not, it could not

statements made on the covers of the books and videotape. They also supported Disney's claim on demurrer that the advertising statements made on those covers were contained in the text of the books themselves. Finally, they bolstered Keimer's allegation that Disney "knew, or by the exercise of reasonable care should have known, that the advertisements were untrue or misleading," because the Library of Congress page of the first best seller's paperback reprint[5] contained the following disclaimer: "NOTE: Investment clubs commonly compute their annual 'return' by calculating the increase in their total club balance over a period of time. Since this increase includes the dues that the members pay regularly, this 'return' may be different from the return that might be calculated for a mutual fund or a bank. Since the regular contributions are an important part of the club philosophy, the Ladies' returns described in this book are based on this common calculation." The parties agree that this disclaimer was an admission that the trumpeted rates of return had not been calculated in the manner customary to banks and mutual funds. And, as was subsequently revealed, the investment club's rates of return were far below the 23.4 percent proclaimed in the advertisement. The judicially noticed materials also reveal that this disclaimer was not repeated in any of the subsequent publications, and that the inflated investment return claims continued to be used to advertise the club's books. For these alleged wrongs, the complaint sought an injunction barring Disney from continuing to use the false statements in advertising and requiring it to publish retractions or corrections in future publications. The complaint also sought disgorgement of Disney's profits from the sale of the books and videotape.

Respondents demurred to the complaint on the ground that it failed to state a cause of action. They maintained that the allegedly false advertising statements on the book and videotape covers were taken directly from information contained in the materials themselves. As such, they contended that the statements were absolutely protected by the First Amendment and California's constitutional right to freedom of speech. The trial court sustained the demurrers without leave to amend and entered judgment for respondents. This appeal followed.

## II. *Standard of Review*

■ We review de novo the trial court's entry of judgment from a demurrer sustained without leave to amend. In so doing, we assume the truth

---

have adequately evaluated Disney's ground for demurrer, which it sustained. To the extent that the request for judicial notice asked the trial court to consider the books for the existence of certain statements made in their pages, and not for determining whether those statements were true or false, judicial notice was appropriate. (Evid. Code, § 452, subd. (h).)

[5] The Beardstown Ladies' Common-Sense Investment Guide—How We Beat the Stock Market—and How You Can, Too.

of all properly pleaded facts, and examine them to determine whether they state a cause of action on any available legal theory. If we determine that a cause of action has been stated, we must find that the trial court abused its discretion in sustaining the demurrer without leave to amend. (*Day* v. *AT & T Corp.*, *supra*, 63 Cal.App.4th at p. 335.)

### III. *Discussion*

We first consider California's Unfair Trade Practices Act[6] and determine that appellant's complaint stated viable causes of action for unfair business practice under section 17200 et seq. and false advertising under section 17500 et seq. We next consider the nature of the statements alleged in the complaint to be false and hold that they are commercial speech. Because the state has a legitimate interest in regulating false commercial speech, we conclude that the statements, as alleged, are not entitled to First Amendment protection. Finally, we briefly address Disney's proposed analytical approach, which we reject.

### A. *The Unfair Trade Practices Act*

 Keimer's complaint alleged that Disney violated the Unfair Trade Practices Act by disseminating advertisements for The Beardstown Ladies' books and videotape which it knew were false and misleading, and which it should have known in the exercise of reasonable care were false and misleading. As such, it was alleged that Disney had violated section 17500's false advertising law, and section 17200's unfair business practice provisions.[7] Disney does not contend that the complaint's allegations fail to state prima facie causes of action under these provisions. Rather, it maintains that free speech protections shield the statements from California's regulatory

---

[6]See footnote 1, *ante*.

[7]Section 17200 provides as follows: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

Section 17500 states in relevant part that: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

powers. As implicitly conceded by Disney, the complaint does contain facts sufficient to state causes of action under the Unfair Trade Practices Act.

### B. *The Constitutional Right to Freedom of Speech*

In sustaining Disney's demurrer on the ground that the complaint failed to state a cause of action, the trial court accepted Disney's argument that the advertising statements were entitled to First Amendment protection because they repeated statements made in the books and videotape themselves. In making this claim, Disney characterized the statements in question as non-commercial speech, entitled to full free speech protection. Appellant maintains that the advertising statements made on the book jackets must be viewed as commercial speech which, when false or misleading, is entitled to no First Amendment protection at all and may be entirely prohibited.

### C. *The Commercial Speech Doctrine*

The commercial speech doctrine was first enunciated by the United States Supreme Court in *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748 [96 S.Ct. 1817, 48 L.Ed.2d 346] (*Virginia State*). There, the court acknowledged that commercial speech, characterized as "speech that does 'no more than propose a commercial transaction'" was entitled to a degree of First Amendment protection, but that the protection was limited: commercial speech could be regulated and restricted in a manner that could be justified by legitimate state interests. (425 U.S. at pp. 770-772, & fn. 24 [96 S.Ct. at pp. 1829-1831].) In explaining the rationale for the limitation, the court pointed out some "commonsense differences" between commercial speech and other varieties, which justified a different degree of protection: "The truth of commercial speech, for example, may be more easily verifiable by its disseminator . . . in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else," and because advertising is indispensable in the commercial world it may be more durable than other types of speech, as "there is little likelihood of its being chilled by proper regulation and foregone entirely." (*Id.* at pp. 271-272, fn. 24 [96 S.Ct. at p. 1830].) These differences, the court reasoned, justified less tolerance for inaccurate statements. They also rendered appropriate those restrictions designed to prevent commercial speech from being deceptive, such as by requiring the message to include any necessary warnings and disclaimers. (*Ibid.*)

Since deciding *Virginia State*, the United States Supreme Court has articulated an additional reason for permitting appropriate governmental regulation of commercial speech: "To require a parity of constitutional protection

for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech." (*Ohralik* v. *Ohio State Bar Assn.* (1978) 436 U.S. 447, 456 [98 S.Ct. 1912, 1918, 56 L.Ed.2d 444].) Finally, the Supreme Court in *Virginia State* stated, in no uncertain terms, that provably false commercial speech was entitled to *no First Amendment protection at all.* (*Virginia State, supra,* 425 U.S. at p. 771 [96 S.Ct. at p. 1830].)

As noted, *Virginia State* defined commercial speech as speech which does no more than propose a commercial transaction. This type of speech has been labeled "core" commercial speech. Some speech, however, cannot be characterized as core commercial speech, because it serves some purpose beyond the pure proposition of a commercial transaction. (*Bolger* v. *Youngs Drug Products Corp.* (1983) 463 U.S. 60, 66 [103 S.Ct. 2875, 2879-2880, 77 L.Ed.2d 469] (*Bolger*).) In *Bolger,* the Supreme Court considered the constitutionality of a federal statute prohibiting the unsolicited mailing of advertisements for contraceptive products. The court was faced with evaluating a variety of written materials sent by a contraceptive manufacturer and distributor, most of which it determined were core commercial speech, proposing nothing more than a commercial transaction because they consisted primarily of price and quantity information. Other mailing materials were not so easily categorized. For example, two of the mailings were informational pamphlets which discussed topics such as human sexuality and venereal disease, but also made mention of the contraceptive products. (*Id.* at pp. 66-67, & fns. 12 and 13 [103 S.Ct. at pp. 2879-2880].)

In determining whether the pamphlets were commercial or noncommercial speech, the *Bolger* court identified three characteristics of the mailings which, taken together, convinced it that the speech in question was commercial, in spite of the fact that the pamphlets also contained discussions of important public issues. First, the pamphlets were conceded to be advertisements; second, the materials made reference to a specific product; and finally, the disseminator of the information had an economic motivation for mailing the pamphlets. (*Bolger, supra,* 463 U.S. at pp. 66-68 [103 S.Ct. at pp. 2879-2881].) Having determined that the speech in question was commercial in nature, the *Bolger* court proceeded to determine the validity of the statutory restrictions on the speech itself, an analysis we will undertake after first deciding, as the court did in *Bolger,* whether the statements made on the covers of The Beardstown Ladies' books and videotape constituted commercial or noncommercial speech.[8]

---

[8]Disney has taken the position that the proper analysis is to determine whether the investment return statements made in the books themselves are commercial or noncommer-

We note, first, that an answer to this question could begin and end with the complaint's factual allegations, which in essence assert that the statements are of a core commercial nature. Specifically, the complaint alleges that the advertising campaign for the books and videotape was based primarily on The Beardstown Ladies' investment returns, and were made material features of Disney's marketing and advertising of the publications. This language can be interpreted as a claim that the entire purpose of the statements was to urge the public to buy the books, that is, to propose a commercial transaction. These allegations, which we must accept as true on review of a ruling on demurrer, could not be contradicted by the judicially noticed materials, which would, at best, raise a factual issue regarding the core nature of the statements, but which could not support the sustaining of a demurrer where such factual questions could not be resolved. In any case, merely looking at the judicially noticed materials can also lead us to the commonsense conclusion that the book and videotape covers were designed with a single purpose in mind, to sell the books. In other words, they appear to propose a commercial transaction. Of course, we do not resolve this issue, but merely conclude that on demurrer any argument that a commercial transaction was not proposed is premature and will have to await further court proceedings.

■ Even assuming the complaint's allegations and the judicially noticed materials were not sufficient to support the inference that the statements were core commercial speech, we reach the same conclusion by considering the three *Bolger* characteristics applicable when the nature of the speech is not obvious. First, Disney has conceded that the book covers are advertisements, but claims, correctly, that this is not the end of the inquiry. We must also determine whether the speech refers to a specific product, which in the case of a book or videotape cover it obviously does. The covers are touting the content of the material inside, which the consumer can only discover by purchasing the product. And finally, we consider whether Disney had an economic motivation in making the statements. We must conclude that it did, for what other reason would it have for publishing the books?[9] It is true, of course, that the subject matter of the books—achieving economic security

cial, and then to treat the statements on the covers in the same manner. As we discuss in part III.D., *post*, we reject this approach in favor of considering the nature of the challenged speech itself, that is, the statements made on the covers.

[9]Appellant makes reference to various texts written by publishing industry experts, which maintain that book covers are the ultimate advertising tool for book sales. Obviously, these texts have no place in informing our decision in this appeal from the sustaining of a demurrer. However, we do take into account the administrative and judicial pronouncements cited by appellant, noting the importance of book jackets to the advertisement and sale of books. (See, e.g., *In the Matter of Witkower Press, Inc.* (1960) 57 F.T.C. 145; *Securities & Exch. Com'n* v. *C. R. Richmond & Co.* (9th Cir. 1977) 565 F.2d 1101; and *Toho Co., Ltd.* v. *William Morrow and Co., Inc.* (C.D.Cal. 1998) 33 F.Supp.2d 1206.)

by investing—is of interest to the general public. However, speech can be considered commercial even though it contains information which enables the public to " '. . . cope with the exigencies of their period.' " (*Bolger, supra,* 463 U.S. at p. 68, & fn. 15 [103 S.Ct. at p. 2881].) The Supreme Court has "made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech. [Citation.]" (*Id.* at p. 68 [103 S.Ct. at p. 2881].) We hold that the statements made on the book and videotape covers are commercial speech, entitled only to qualified free speech protection.

### D. *First Amendment Protection for Commercial Speech*

■ By holding that the statements at issue constitute commercial speech we do not strip them of all free speech protections. We do, however, limit those protections by allowing rational and carefully crafted restrictions. In *Central Hudson Gas & Elec.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557 [100 S.Ct. 2343, 65 L.Ed.2d 341] (*Central Hudson*), the Supreme Court articulated a four-pronged analysis for evaluating the validity of commercial speech restrictions. As we shall see, under the allegations of appellant's complaint, the statements on the book and videotape covers lose any hope of constitutional protection under *Central Hudson*'s very first prong. That prong asks, as a threshold, whether the commercial speech concerns lawful activity and is *not misleading.* (*Id.* at p. 566 [100 S.Ct. at p. 2351].) As explained in *Bolger,* "[t]he State may deal effectively with false, deceptive, or misleading sales techniques." (*Bolger, supra,* 463 U.S. at p. 69 [103 S.Ct. at p. 2881], citing *Virginia State, supra,* 425 U.S. 748.) Appellant's complaint alleges that the investment return claims made on the book and videotape covers, which we have held to be commercial speech, were false. Accepting these allegations as true, we must conclude that the complained of statements are entitled to no First Amendment free speech protections.

A brief review of the remaining *Central Hudson* prongs demonstrates why California's Unfair Trade Practices Act is a legitimate vehicle for restricting false or misleading advertising.[10] The second *Central Hudson* step for evaluating the validity of commercial speech regulation is to determine whether the governmental interest in enacting the regulation is substantial. (*Central Hudson, supra,* 447 U.S. at p. 566 [100 S.Ct. at p. 2351].) Clearly, the State of California has a fervent interest in protecting the public from advertising which is deceptive or is likely to deceive and in " '. . . insuring that the stream of commercial information flow cleanly as well as freely.' [Citations.]" (*People* v. *Superior Court (Olson), supra,* 96 Cal.App.3d at p. 193.)

---

[10]Of course, the constitutionality of the Unfair Trade Practices Act has already been firmly established. (See, e.g., *People* v. *Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 195 [157 Cal.Rptr. 628].)

This being the case, we determine whether the regulation directly advances the government's interest and whether it is reasonably tailored to serve that interest (*Central Hudson*'s third and fourth prongs). (*Central Hudson, supra,* 447 U.S. at p. 566 [100 S.Ct. at p. 2351].) Obviously, legislation designed specifically to protect consumers from deceptive or misleading advertising directly advances the state's interest in preventing such abuses. Nor has there been any suggestion by respondents that the Unfair Trade Practices Act is overbroad. The act does not seek to restrict noncommercial speech in any manner. It is tailored to protect the public from false commercial speech, a category of speech which has been held to be more durable, verifiable and of a lower social value than fully protected noncommercial speech.

### E. *Respondents' Contentions*

Interestingly, Disney's analysis of the issues does not focus on (and in fact barely addresses) the actual advertising statements on the book and video-tape covers. Rather, it maintains that we must look to the content of the books themselves, which make the same claims as those alleged to be false on the covers, and determine whether this book *content* is entitled to free speech protections. Disney's attempt to obtain immunity by linking the alleged verifiably false statements to statements made in a constitutionally protected medium, such as a book, fails. It has provided no convincing authority that would compel us to so completely eviscerate California's Unfair Trade Practices Act.

Disney begins by making an assertion which no one involved in modern jurisprudence can reasonably dispute—the *content* of The Beardstown Ladies' books is entitled to the full protection of the First Amendment. This conclusion, though accurate, does nothing to advance a reasoned analysis of the issues before us. We turn to the crux of respondents' argument, which is that if a book's content is noncommercial and entitled to First Amendment protection, then material taken from that content and used in advertising is also entitled to full First Amendment protection. We do not dwell at length on the argument, because a review of Disney's authorities reveals that each is materially distinguishable from the matter before us in one of two ways. They either involved advertising statements which were true, or were opinion or "rhetorical hyperbole" and thus were not verifiably false or misleading, as were the investment return figures here; or they involved the infringement on rights which are less zealously protected than the right of consumers to be free from false advertising. Furthermore, the bulk of the cases relied on by Disney were resolved on summary judgment, where the court was properly called upon to make a decision based upon evidence presented, whereas we are bound by the complaint's allegations and matters judicially noticed.

In *Lane* v. *Random House, Inc.* (D.D.C. 1995) 985 F.Supp. 141, Lane, a well-known Kennedy conspiracy theorist, sued Random House for defamation and other related claims, because advertisements for a book disputing the conspiracy theory claimed that Lane was "guilty of misleading the American public." Summary judgment was entered for Random House, in part because the court held the speech in question was not commercial. The basis for the finding, which Disney has glossed over, was the court's legitimate concern in protecting " 'advertising which summarizes *an argument or opinion* contained in the book' " as contrasted with statements that are objectively verifiable as true or false. (*Id.* at pp. 150, 152, italics added.) The statement Lane complained of, being "rhetorical hyperbole [which] cannot be proven true or false" was not actionable. (*Id.* at p. 150.)

In *Guglielmi* v. *Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 872-873 [160 Cal.Rptr. 352, 603 P.2d 454] (*Guglielmi*) and *Page* v. *Something Weird Video* (C.D.Cal. 1996) 960 F.Supp. 1438, 1444-1445 (*Page*), the courts held that promotional use of celebrities' *true* likenesses on a video and a made for television movie were not actionable because the use was incidental to the publication of the constitutionally protected materials. Although not asked to resolve the issue, both courts commented on the importance of distinguishing between truthful and false promotions, with constitutional protection inuring to the former, but not to the latter. (*Page, supra,* at pp. 1444-1445; *Guglielmi, supra,* at p. 865, fn. 6.) Yet another critical factor distinguishes these two cases from the one before us. Both were right of publicity cases, a right which "has not been held to outweigh the value of free expression." (*Guglielmi, supra,* at p. 872.) By contrast, the right of California consumers to be free from deceptive or misleading advertising has been held to be sufficiently important to outweigh the unfettered right to free expression. (*People* v. *Superior Court* (*Olson*), *supra,* 96 Cal.App.3d at p. 195.)

In *National Life Ins. Co.* v. *Phillips Pub., Inc.* (D.Md. 1992) 793 F.Supp. 627, the plaintiff sued the publisher of investment newsletters, claiming it had been defamed in materials promoting the newsletters because the promotional materials contained newsletter reprints critical of the plaintiff. The court held, based upon the evidence before it on summary judgment, that the statements were not commercial speech because they were not included to aid in the sale of a product, but were presented in the context of and incidental to a public controversy. It also held that the evidence did not support a conclusion that the allegedly defamatory statements were included in the newsletter to increase sales. (*Id.* at p. 644.) We are not presented here with a summary judgment, or with any evidence which we can use to evaluate the *Bolger* factors. Rather, we have appellant's allegations which,

as discussed above, satisfy the *Bolger* factors for commercial speech. *National Life* is of no help to respondents.[11]

Finally, respondents contend that they had no duty to investigate the accuracy of the investment return claims made in The Beardstown Ladies' books, which eventually made their way to the book covers. While this may be the case, the argument has no relevance here. Appellant has alleged that respondents knew or should have known that the *advertising statements* were false or misleading. He has not alleged that they should have investigated the truth of the statements contained in the books. The distinction is critical, because the Unfair Trade Practices Act imposes liability upon an advertiser for untrue or misleading statements which the advertiser, in the exercise of reasonable care, should have known were false. (§ 17500.) Disney cannot shield itself from the statute's mandates by linking its advertising to the books' contents.

## IV. *Conclusion and Disposition*

Our Supreme Court has recently reaffirmed the viability and strength of the Unfair Trade Practices Act, and has noted that each time the Legislature has amended the Act, ". . . it has done so only to *expand* its scope, never to narrow it." (*Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570 [71 Cal.Rptr.2d 731, 950 P.2d 1086], italics in original.) Given California's legitimate and broad interest in protecting its populace from the dissemination of false or misleading advertising, we hold that appellant should be permitted to proceed with his action seeking remedies under the Unfair Trade Practices Act for respondents' allegedly false advertising statements. The entry of judgment is reversed and the matter is remanded for further proceedings. Appellant shall recover his costs on appeal.

McGuiness, P. J., and Parrilli, J., concurred

Respondents' petitions for review by the Supreme Court were denied March 1, 2000. George, C. J., and Brown, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.

---

[11]Another case relied upon by respondents, *Oxycal Laboratories, Inc.* v. *Jeffers* (S.D.Cal. 1995) 909 F.Supp. 719, involved a challenge to allegedly false statements made in a book itself. It did not involve statements made in advertisements for the book.