93 Cal.Rptr.2d 854 (2000)
79 Cal.App.4th 165
Marc KASKY, Plaintiff and Appellant,
v.
NIKE, INC., et al., Defendants and Respondents.
No. A086142.
Court of Appeal, First District, Division One.
March 20, 2000.
Review Granted June 21, 2000.
*855 Paul R. Hoeber, Esq., Solana Beach, Bushnell, Caplan & Fielding, LLP, Alan M. Caplan, Esq., Milberg, Weiss, Bershad, Hynes & Lerach, LLP, William S. Lerach, Esq., San Diego, for Plaintiff and Appellant.
Brobeck, Phleger & Harrison, LLP, Robert P. Varian, Esq., San Francisco, for Defendants and Respondents
SWAGER, J.
In this private attorney general action against Nike, Inc., and five of its corporate officers, the nominal plaintiff appeals from a judgment of dismissal entered on an order sustaining the defendants' demurrer on First Amendment grounds. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
Nike, Inc., a marketer of athletic shoes and sports apparel, has grown into a large multinational enterprise through a marketing strategy centering on a favorable brand image, which is associated with a distinctive logo and the advertising slogan, "Just do it." To maintain this image, the company invests heavily in advertising and *856 brand promotion, spending no less than $978,251,000 for the year ending May 31, 1997. The promotional activities include product sponsorship agreements with celebrity athletes, professional athletic teams, and numerous college athletic teams. Reviewing the company's successful marketing strategy, the 1997 annual report asserts, "[W]e are a company ... that is based on a brand, one with a genuine and distinct personality, and tangible, emotional connections to consumers the world over...."
Like other major marketers of athletic shoes and sports apparel, Nike contracts for the manufacture of its products in countries with low labor costs. In Nike's case, the actual production facilities are owned by South Korean and Taiwanese companies that manufacture the products under contract with Nike. The bulk of Nike products are manufactured in China, Thailand, and Indonesia, though some components or products involving more complex technology are manufactured in South Korea or Taiwan. In 1995, a Korean company opened up a major new facility in Vietnam, giving that country also a significant share of Nike's production. The record indicates that between 300,000 and 500,000 workers are employed in Asian factories producing Nike products. The complaint alleges that the vast majority of these workers are women under the age of 24.
The company has sought to foster the appearance and reality of good working conditions in the Asian factories producing its products. All contractors are required to sign a Memorandum of Understanding that, in general, commits them to comply with local laws regarding minimum wage, overtime, child labor, holidays and vacations, insurance benefits, working conditions, and other similar matters and to maintain records documenting their compliance. To assure compliance, the company conducts spot audits of labor and environmental conditions by accounting firms. Early in 1997, Nike retained a consulting firm, co-chaired by Andrew Young, the former ambassador to the United Nations, to carry out an independent evaluation of the labor practices in Nike factories. After visits to 12 factories, Young issued a report that commented favorably on working conditions in the factories and found no evidence of widespread abuse or mistreatment of workers.
Nevertheless, Nike was beset in 1996 and 1997 with a series of reports on working conditions in its factories that contrasted sharply with the favorable view in the Young report. An accounting firm's spot audit of the large Vietnamese factory, which was leaked to the press by a disgruntled employee, reported widespread violations of local regulations and atmospheric pollution causing respiratory problems in 77 percent of the workers. An investigator for Vietnam Labor Watch found evidence of widespread abuses and a pervasive "sense of desperation" from 35 interviews with Vietnamese workers. An Australian organization published a highly critical case study on Nike's Indonesian factories. And the Hong Kong Christian Industrial Committee released an extensively documented study of several Chinese factories, including three used by Nike, which reported 11- to 12-hour work days, compulsory overtime, violation of minimum wage laws, exposure to dangerous levels of dust and toxic fumes, and employment of workers under the age of 16.
These reports put Nike under an unusual degree of public scrutiny as a company exemplifying a perceived social evil associated with economic globalizationthe exploitation of young female workers in poor countries. An article in The Oregonian of Portland, Oregon, asserted: "The company's worldwide production system has turned the Beaverton giant into an international human rights incident." (Manning, Tracks Across the Globe  Nike's Global Machine Goes on Trial (Nov. 9, 1997) p. Al.) The News & Record of Greensboro, North Carolina, asked, "But who wants to enjoy products made on the backs of human *857 misery?" (Nike's Swoosh: A Symbol of Money and Misery (Nov. 13, 1997) p. A14.) The New York Times carried a series of eight articles in 1996 and 1997, reporting "grim conditions" and widespread human rights abuses in Nike factories. And a CBS television report juxtaposed the complaints of a Vietnamese worker with disclaimers by company officials.
Nike countered with a public relations campaign that defended the benefits of its Asian factories to host countries and sought to portray the company as being in the vanguard of responsible corporations seeking to maintain adequate labor standards in overseas facilities. Press releases responded to sweatshop allegations, addressed women's issues, stressed the company's code of conduct, and broadly denied exploitation of underage workers. A more lengthy press release, entitled "Nike Production Primer" answered a series of allegations with detailed information and footnoted sources. Another release drew attention to the favorable Young report and invited readers to consult it on-line. A letter to the presidents and athletic directors of those colleges sponsoring Nike products defended the company's labor practices. And company officials sought to rebut specific charges in letters to the editor and to nonprofit organizations.
The complaint alleges that, in the course of this public relations campaign, Nike made a series of six misrepresentations regarding its labor practices: (1) "that workers who make NIKE products are ... not subjected to corporal punishment and/or sexual abuse;" (2) "that NIKE products are made in accordance with applicable governmental laws and regulations governing wages and hours;" (3) "that NIKE products are made in accordance with applicable laws and regulations governing health and safety conditions;" (4) "that NIKE pays average line-workers double-the-minimum wage in Southeast Asia;" (5) "that workers who produce NIKE products receive free meals and health care;" and (6) "that NIKE guarantees a `living wage' for all workers who make NIKE products." In addition, the complaint alleges that NIKE made the false claim that the Young report proves that it "is doing a good job and `operating morally.'"
The first and second causes of action, based on negligent misrepresentation and intentional or reckless misrepresentation, alleged that Nike engaged in an unlawful business practice in violation of Business and Professions Code section 17200 by making the above misrepresentations "In order to maintain and/or increase its sales and profits ... through its advertising, promotional campaigns, public statements and marketing...." The third cause of action alleged unfair business practices within the meaning of section 17200, and the fourth cause of action alleged false advertising in violation of Business and Professions Code section 17500. The prayer sought an injunction ordering Nike "to disgorge all monies" that it acquired by the alleged unlawful and unfair practices, "to undertake a Court-approved public information campaign" to remedy the misinformation disseminated by its false advertising and unlawful and unfair practices, and to cease "[misrepresenting the working conditions under which NIKE products are made...."
Nike and the individual defendants filed demurrers to the complaint challenging the application of Business and Professions Code sections 17200 and 17500 and contending that the complaint is barred by the First Amendment to the United States Constitution and article I, section 2(a), of the California Constitution. The trial court regarded the constitutional distinction between commercial and noncommercial speech to be dispositive. Following a hearing, the court sustained the demurrers without leave to amend and entered a judgment of dismissal from which the plaintiff appeals.

DISCUSSION
Like the trial court, we chose to analyze the important constitutional issues raised *858 by the action and express no opinion as to the multiple objections raised by Nike regarding the application of Business and Professions Code section 17200 to the facts of the case.
"On appeal from a judgment of dismissal after a demurrer is sustained without leave to amend, appellate courts assume the truth of all facts properly pleaded by the plaintiff-appellant." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1999) par. 8:136, p. 8-65; Day v. AT & T Corp. (1998) 63 Cal.App.4th 325, 331, 74 Cal.Rptr.2d 55.) Hence, we are obliged to assume that Nike in fact misrepresented facts regarding the labor practices in its Asian factories to induce consumers to buy its products. Plaintiff relies chiefly on the theory that these alleged misrepresentations fall within the category of commercial speech for which Nike can be held accountable under accepted constitutional principles.
Since extending First Amendment protection to commercial speech in Bigelow v. Virginia (1975) 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 and Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346, the United States Supreme Court has "been careful to distinguish commercial speech from speech at the First Amendment's core. `"[Commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," and is subject to "modes of regulation that might be impermissible in the realm of noncommercial expression."'" (Florida Bar v. Went for It, Inc. (1995) 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541, citing Board of Trustees of State Univ. of N.Y. v. Fox (1989) 492 U.S. 469, 477, 109 S.Ct. 3028,106 L.Ed.2d 388.)[1]
A line of decisions extending from Va. Pharmacy Bd. has sanctioned restraints on commercial speech that is false, deceptive or misleading. (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 770-771, 96 S.Ct. 1817.) As stated in Bates v. State Bar of Arizona (1977) 433 U.S. 350, 383, 97 S.Ct. 2691, 53 L.Ed.2d 810, "[advertising that is false, deceptive, or misleading of course is subject to restraint. [Citation.] Since the advertiser knows his product and has a commercial interest in its dissemination, we have little worry that regulation to assure truthfulness will discourage protected speech. [Citation.] ... [T]he public and private benefits from commercial speech derive from confidence in its accuracy and reliability. Thus, the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena." (See also Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy (1994) 512 U.S. 136, 142, 114 S.Ct. 2084, 129 L.Ed.2d 118; Edenfield v. *859 Fane (1993) 507 U.S. 761, 768, 113 S.Ct. 1792, 123 L.Ed.2d 543; People v. Morse (1993) 21 Cal.App.4th 259, 265, 25 Cal. Rptr.2d 816; People v. Superior Court (Olson), supra, 96 Cal.App.3d at p. 191, 157 Cal.Rptr. 628.)
To distinguish between commercial and noncommercial speech, we begin with the leading United States Supreme Court decision, Bolger v. Youngs Drug Products Corp. (1983) 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469. There, a condom manufacturer faced prosecution for unsolicited mailings regarding its product. Most of the mailings consisted of advertisements conveying price and quantity information about the plaintiffs brand, which, the court held, fell "within the core notion of commercial speech'speech which does "no more than propose a commercial transaction."' [Citation.]" (Id. at p. 66, 103 S.Ct. 2875, fn. omitted.) But the manufacturer also mailed two informational pamphlets about condom use, containing no more than references to its brand of condoms. Holding that these pamphlets were also commercial speech, the court considered a series of relevant characteristics: "The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech. [Citation.] Similarly, the reference to a specific product does not by itself render the pamphlets commercial speech. [Citation.] Finally, the fact that [plaintiff] has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech. [Citations.] [¶] The combination of all these characteristics, however, provides strong support for the District Court's conclusion that the informational pamphlets are properly characterized as commercial speech." (Id. at pp. 66-67, 103 S.Ct. 2875, fns. omitted.)[2]
The Bolger distinction was applied by the Ninth Circuit in Association of Nat. Advertisers, Inc. v. Lungren, supra, 44 F.3d 726, to representations, like those at issue here, that appealed to the consumer's sense of social responsibility. Former California Business and Professions Code section 17508.5[3] prohibited a manufacturer or distributor of consumer goods from making a series of representations regarding *860 the environmental impact of the goods, such as that they were "ozone friendly" or "biodegradable," unless the goods met certain statutory definitions of these terms. Though falling outside the "core notion" of commercial speech, the court concluded that these environmental representations constituted commercial speech as defined by the three characteristics recognized in the Bolger decision. An earlier decision, on which appellant relies, concerned representations about the effects of a product on health. In National Com'n on Egg Nutrition v. F.T.C. (7th Cir.1977) 570 F.2d 157, the court reviewed a Federal Trade Commission order directing a trade association to desist from disseminating advertisements to the effect that "there is no scientific evidence that eating eggs increases the risk of heart and circulatory disease." (Id. at p. 158, fn. omitted.) The court held that the advertisements fell within the category of "`deceptive or misleading' commercial speech," subject to restraint under the First Amendment. (Id. at p. 162, citation omitted.)
Though the Bolger, Egg Nutrition, and Association of National Advertisers decisions present certain points of similarity to the present case, they differ in one fundamental respect: they concern communications conveying information or representations about specific characteristics of goods. In contrast, the speech at issue here was intended to promote a favorable corporate image of the company so as to induce consumers to buy its products. A Nike executive expressed this business objective in a letter to the editor: "Consumers ... want to know they support companies with good products and practices.... During the shopping season, we encourage shoppers to remember that Nike is the industry's leader in improving factory conditions."
The fact that the communications at issue here served to promote a favorable corporate image through press releases and letters takes them outside two of the three characteristics of commercial speech noted in the Bolger decisionadvertising format and reference to specific product. We recognize that false press releases may support claims for damages or injunctive relief (S.E.C. v. Rana Research, Inc. (9th Cir.1993) 8 F.3d 1358; Southwell v. Mallery, Stern & Warford (1987) 194 Cal. App.3d 140, 142-143, 239 Cal.Rptr. 371; cf., Semco, Inc. v. Amcast, Inc., supra, 52 F.3d at pp. 112-113), and we are mindful that the Bolger court did not "mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial." (Bolger v. Youngs Drug Products Corp., supra, 463 U.S. at p. 67, fn. 14, 103 S.Ct. 2875.) But we think that a public relations campaign focusing on corporate image, such as that at issue here, calls for a different analysis than that applying to product advertisement.
The question of possible rights to be accorded to advertising or public relations devoted to enhancement of a corporate image may revolve around issues of property rights, rather than First Amendment protections, where the speech lacks "intrinsic meaning" or public interest. (Friedman v. Rogers (1979) 440 U.S. 1, 12, 99 S.Ct. 887, 59 L.Ed.2d 100; see also Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra, 447 U.S. at p. 580, 100 S.Ct. 2343 (cone. opn. of Stevens, J.).) But the case at bar lies in familiar First Amendment territorypublic dialogue on a matter of public concern. Though drafted in terms of commercial speech, the complaint in fact seeks judicial intervention in a public debate.
The "heart of the First Amendment's protection" lies in "`the liberty to discuss publicly and truthfully all matters of public concern.... Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.'" (First National Bank of Boston v. Bellotti (1978) 435 U.S. 765, 776, 98 S.Ct. *861 1407, 55 L.Ed.2d 707, quoting Thornhill v. Alabama (1940) 310 U.S. 88, 101-102, 60 S.Ct. 736, 84 L.Ed. 1093.) In crafting this much quoted language,[4] the Thornhill court noted that the "exigencies" of the colonial period which gave birth to the First Amendment, centered around freedom from oppressive administration of government, but, in the industrial society of 1940, the same constitutionally protected "area of free discussion" embraced the dissemination of information about labor disputes. (Thornhill v. Alabama, supra, at p. 102, 60 S.Ct. 736; see also Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 762-763, fn. 17, 96 S.Ct. 1817; Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d at p. 511, 217 Cal.Rptr. 225, 703 P.2d 1119.) By the same logic, the labor practices of foreign contractors of domestic companies come within the "exigencies" of our times.
Nike exemplifies the perceived evils or benefits of labor practices associated with the processes of economic globalization. Though participants in purely private labor disputes are entitled to certain First Amendment protections,[5] Nike's strong corporate image and widespread consumer market places its labor practices in the context of a broader debate about the social implications of employing low-cost foreign labor for manufacturing functions once performed by domestic workers. We take judicial notice that this debate has given rise to urgent calls for action ranging from international labor standards to consumer boycotts. Information about the labor practices at Nike's overseas plants thus constitutes data relevant to a controversy of great public interest in our times.
Freedom of "`expression on public issues "has always rested on the highest rung of the hierarchy of First Amendment values."' [Citations.]" (FCC v. League of Women Voters of California (1984) 468 U.S. 364, 381, 104 S.Ct. 3106, 82 L.Ed.2d 278.) As stated in New York Times Co. v. Sullivan (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, "[t]he general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard ... 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citation.]" (Id. at p. 269, 84 S.Ct. 710.) And, it represents a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open...." (Id. at p. 270, 84 S.Ct. 710.)
It follows that "under the free speech guaranty the validity and truth of declarations in political disputes over issues of public interest must be resolved by the public and not by a judge." (Leonardini v. Shell Oil Co., supra, 216 Cal. App.3d at p. 579, fn. 10, 264 Cal.Rptr. 883.) "In the context of ... public debate on a matter of public interest, the truth of the statement is irrelevant." (Id. at p. 577, 264 Cal.Rptr. 883; see also Wilson v. Superior Court (1975) 13 Cal.3d 652, 659, 119 Cal.Rptr. 468, 532 P.2d 116; O'Connor v. Superior Court (1986) 177 Cal.App.3d 1013, 1019, 223 Cal.Rptr. 357.) In the famous words of Judge Learned Hand, the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." (United States v. Associated Press (S.D.N.Y.1943) 52 F.Supp. 362, 372; see also New York *862 Times Co. v. Sullivan, supra, 376 U.S. at p. 270, 84 S.Ct. 710.)
By protecting the public's access to "diverse and antagonistic sources" (Associated Press v. United States (1945) 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013), the First Amendment serves an "informational purpose" (First National Bank of Boston v. Bellotti, supra, 435 U.S. at p. 782, fn. 18, 98 S.Ct. 1407), guaranteeing "the public access to discussion, debate, and the dissemination of information and ideas." (Id. at p. 783, 98 S.Ct. 1407, fn. omitted; see also id. at p. 777, fn. 12, 98 S.Ct. 1407.) The citizen enjoys this right of access to the free flow of information and ideas both for purposes of political decisionmaking in a democracythe traditional "core" of the First Amendment[6] and for private decisions significant to the conduct of life.[7] In Linmark Associates, Inc. v. Willingboro (1977) 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155, the court struck down a local ordinance banning "for sale" signs in front of residences, which was intended to dampen home sales motivated by racial fears. The First Amendment, the court held, prohibits any attempt to regulate the information available for the important personal choice of purchasing or selling a home. "That information, which pertains to sales activity in Willingboro, is of vital interest to Willingboro residents, since it may bear on one of the most important decisions they have a right to make: where to live and raise their families." (Id. at p. 96, 97 S.Ct. 1614.)
The press releases and letters at issue here cross the boundary between political and private decisionmaking. The citizen may want to translate personal discontent over Nike's labor practices into political action or may merely wish to refrain from purchasing its products manufactured by undesired labor practices, just as he or she may wish to buy products with a union identification. (See Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d at p. 511, 217 Cal.Rptr. 225, 703 P.2d 1119 ["an advertisement informing the public that the cherries for sale at store X were picked by union workers ... communicates a message beyond that related to the bare economic interests of the parties."].) In either case, "the First Amendment protects the public's interest in receiving information." (Pacific Gas & Elec. Co. v. Public Util. Comm'n (1986) 475 U.S. 1, 8, 106 S.Ct. 903, 89 L.Ed.2d 1.)
Finally, we note that "commercial motivation does not transform noncommercial speech into commercial speech...." (Blatty v. New York Times Co. (1986) 42 Cal.3d 1033, 1048, fn. 3, 232 Cal.Rptr. 542, 728 P.2d 1177; see also Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 762, 96 S.Ct. 1817; Leonardini v. Shell Oil Co., supra, 216 Cal.App.3d at p. 576, fn. 8, 264 Cal.Rptr. 883; O'Connor v. Superior Court, supra, 177 Cal.App.3d at p. 1018, 223 Cal.Rptr. 357.) The present case is not one in which commercial speech is linked to noncommercial speech (Zauderer v. Office of Disciplinary Counsel (1985) 471 U.S. 626, 637, fn. 7, 105 S.Ct. 2265, 85 L.Ed.2d 652; Bolger v. Youngs Drug Products Corp., supra, 463 U.S. at p. 68, 103 S.Ct. 2875; Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra, 447 U.S. at p. 563, fn. 5, 100 S.Ct. 2343), nor *863 again one in which commercial and noncommercial speech are "`inextricably intertwined.' " (Board of Trustees, State Univ. of N.Y. v. Fox, supra, 492 U.S. at p. 474, 109 S.Ct. 3028, citation omitted.) Rather, the record discloses noncommercial speech, addressed to a topic of public interest and responding to public criticism of Nike's labor practices. The fact that Nike has an economic motivation in defending its corporate image from such criticism does not alter the significance of the speech to the "listeners"[8]the consumers or other members of the public concerned with labor practices attending the process of economic globalization.
Our analysis of the press releases and letters as forming part of a public dialogue on a matter of public concern within the core area of expression protected by the First Amendment compels the conclusion that the trial court properly sustained the defendants' demurrer without leave to amend. We see no merit to appellant's scattershot argument that he might still be able to state a cause of action on some theory allowing content-related abridgement of noncommercial speech. The United States Supreme Court allows content-based restrictions on noncommercial speech only if they come within very narrowly defined circumstances, such as libel, obscenity, fighting words (Consolidated Edison Co. v. Public Serv. Comm'n (1980) 447 U.S. 530, 538, fn. 5, 100 S.Ct. 2326, 65 L.Ed.2d 319), or "survive the exacting scrutiny necessitated by a state-imposed restriction of freedom of speech." (First National Bank of Boston v. Bellotti, supra, 435 U.S. at p. 786, 98 S.Ct. 1407.) The complaint does not allege facts coming within these narrow exceptions, and we see no reasonable possibility that it could be amended to do so. (Blank v. Kirwan (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.)
The judgment is affirmed. Costs are awarded to respondent.
STEIN, Acting P.J., and MARCHIANO, J., concur.
NOTES
[1] It has long been recognized that the First Amendment of the United States Constitution applies to the states under the due process clause of the Fourteenth Amendment. (44 Liquormart, Inc. v. Rhode Island (1996) 517 U.S. 484, 489, fn. 1, 116 S.Ct. 1495, 134 L.Ed.2d 711.) In certain contexts, article I, section 2, of the California Constitution offers a "`more definitive and inclusive ...'" protection of free speech than the First Amendment of the United States Constitution (Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 519, 217 Cal.Rptr. 225, 703 P.2d 1119, citation omitted; Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908, 153 Cal.Rptr. 854, 592 P.2d 341). But we see no basis for distinguishing between the federal and state Constitutions with respect to the issues here on appeal and will refer to both Constitutions by use of the term "First Amendment." In declining to differentiate between the state and federal Constitutions, we find support in People v. Superior Court (Olson) 96 Cal.App.3d 181, 157 Cal. Rptr. 628 [equating the protection of commercial speech under the California and federal Constitutions] and Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 257 Cal. Rptr. 708, 771 P.2d 406 [applying same standard of liability for defamation under both Constitutions]. (See also Leonardini v. Shell Oil Co. (1989) 216 Cal.App.3d 547, 555, fn. 1, 264 Cal.Rptr. 883.)
[2] The decisional law offers an array of verbal formulations to distinguish commercial and noncommercial speech. Central Hudson Gas & Elec. v. Public Serv. Comm'n (1980) 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341, broadly describes commercial speech as "expression related solely to the economic interests of the speaker and its audience." (See also In re R.M.J. (1982) 455 U.S. 191, 204, fn. 17, 102 S.Ct. 929, 71 L.Ed.2d 64.) Other decisions refer to a narrower characterization of commercial speech found in Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 762, 96 S.Ct. 1817"speech which does `no more than propose a commercial transaction. . . .'" (E.g., Board of Trustees, State Univ. of N.Y. v. Fox (1989) 492 U.S. 469, 473, 109 S.Ct. 3028, 106 L.Ed.2d 388; Posadas de Puerto Rico Assoc. v. Tourism Co. (1986) 478 U.S. 328, 340, 106 S.Ct. 2968, 92 L.Ed.2d 266.) In Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d at p. 511, 217 Cal.Rptr. 225, 703 P.2d 1119, our high court sought to bridge the gap between this differing language with a somewhat more flexible formulation: "commercial speech is that which has but one purposeto advance an economic transaction." (See cone. opn. of Stevens, J. in Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra, at pp. 579-580, 100 S.Ct. 2343.)

We find our way out of this complexity by relying on the Bolger decision. Our reliance on Bolger follows federal decisions in Association of Nat. Advertisers, Inc. v. Lungren (9th Cir.1994) 44 F.3d 726, 728, and Semco, Inc. v. Amcast, Inc. (6th Cir.1995) 52 F.3d 108, 112-113, and the recent decision in Keimer v. Buena Vista Books, Inc. (1999) 75 Cal.App.4th 1220, 1228-1229, 89 Cal.Rptr.2d 781, and appears to be mandated by Cincinnati v. Discovery Network, Inc. (1993) 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99, which also discusses Bolger as the most pertinent and authoritative precedent dealing with the distinction between commercial and noncommercial speech. In our view, the general discussion of commercial and noncommercial speech in Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d 501, 217 Cal.Rptr. 225, 703 P.2d 1119 is consistent with the more precise guidelines in the Bolger decision.
[3] Repealed. (Stats. 1995, ch. 642, § 2, p. 92.)
[4] See e.g., Time, Inc. v. Hill (1966) 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456; First National Bank of Boston v. Bellotti, supra, 435 U.S. at page 776, 98 S.Ct. 1407; Bolger v. Youngs Drug Products Corp., supra, 463 U.S. at page 68, footnote 15, 103 S.Ct. 2875.
[5] NLRB v. Gissel Packing Co. (1969) 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547; Labor Board v. Virginia Power Co. (1941) 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348; A.F. of L. v. Swing (1941) 312 U.S. 321, 325-326, 61 S.Ct. 568, 85 L.Ed. 855.)
[6] Posadas de Puerto Rico Assoc. v. Tourism Co., supra, 478 U.S. at page 340, footnote 7, 106 S.Ct. 2968 ["such political dialogue is at the core of . . . the first amendment"]. (Citation and internal quotation marks omitted.)
[7] To the extent that the protection of corporate speech benefits the citizen's access to information, corporate rights under the First Amendment may be described as being derivative, i.e., based on the need to protect the public's right of access to information. (DanCohen, Freedoms of Collective Speech: A Theory of Protected Communications by Organizations, Communities, and the State (1991) 79 Cal.L.Rev. 1229, 1233, 1245-1248.) The derivative nature of the corporate right to assert the protection of the First Amendment resolves the paradox of recognizing a right of free speech in an artificial entity "existing only in contemplation of law." (Dartmouth College v. Woodward (1819) 17 U.S.(4 Wheat.) 517, 634, 4 L.Ed. 629, Marshall, J.)
[8] See Linmark Associates, Inc. v. Willingboro, supra, 431 U.S. at page 92, 97 S.Ct. 1614, referring to prospective home buyers as "listeners," entitled to First Amendment protection.