**NEW.NET, INC., Plaintiff,**

v.

**LAVASOFT; Nicolas Stark Computing AB, Defendant.**

**No. CV 03–3180 GAF.**

United States District Court, C.D. California.

May 20, 2004.

Daniel Scott Schecter, David M. Simonds, Latham & Watkins, Los Angeles, CA, Ryan C. Squire, Stephen C. Chuck, Garrett & Tully, Pasadena, CA, for Plaintiff.

Louis J. Levy, Leventhal Senter and Lerman, Tobey B. Marzouk, Marzouk and Parry, Washington, DC, Thomas M. Norminton, Norminton & Wiita, Beverly Hills, CA, Henry D. Fetter, Doniger & Fetter, Los Angeles, CA, Richard J.J. Scarola, Scarola Reavis & Parent, New York City, for Defendants.

**MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO STRIKE AND DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO CAL. CIV. PROC. CODE SEC. 425.16 AND FED. R. CIV. P. 12(c)**

FEESS, District Judge.

### I.

### INTRODUCTION & BACKGROUND [1]

This case presents a dispute between two downloadable software providers, New.net whose software, NewDotNet, is downloaded onto individual computers often without the knowledge or request of the computer owner, and Lavasoft whose software, Ad-aware, is purposefully down-

---

1. A more comprehensive statement of the facts can be found in this Court's November 4, 2003 order denying Plaintiff's motion for a preliminary injunction.

loaded by the computer user to detect and remove programs like the one written by New.net. New.net complains that the injuries caused by Ad-aware's inclusion of NewDotNet in its database are actionable under both state and federal law.

The Court previously denied New.net's motion for a preliminary injunction to halt Lavasoft from including NewDotNet in its database. In ruling on that motion the Court concluded, among other things, that Lavasoft, through its software, was engaging in First Amendment protected speech. Now Lavasoft moves to dismiss the state claims in their entirety under California's anti-SLAPP statute, which provides an expedited procedure for dismissing lawsuits designed to stifle speech on issues of public importance. The Court concludes that the motion is well taken and should be **GRANTED.** Further, the Court concludes that the remaining federal question claims should be dismissed under Rule 12(c).

## A. THE PARTIES AND THEIR SOFTWARE

### 1. New.net and the NewDotNet Software

New.net describes itself as a "leading domain name registry and provider of domain name extensions." (Compl. at 2). It apparently generates revenue through the sale of domain names in nonstandard format such as .free and .shop as opposed to "true" domain names, e.g., .edu, .gov, .org., and .com. Without special software, the internet user who types a nonstandard domain name into his or her browser will not be able to locate the website. New.net deals with this problem by providing its software, NewDotNet, that recognizes the

nonstandard extension and connects the user to the site without requiring the user to know and enter the site's true nonstandard domain name.

Because New.net generates its revenue through the sale of these nonstandard domain names, its ultimate success and, indeed, its very survival, depends on maximizing the value of these names by generating traffic to these sites. That is, it needs to enable increasing numbers of users—most of whom have never sought to do business with New.net—to access New.net's customers' websites. In order to accomplish this goal, New.net must distribute and install NewDotNet on as many computers in the hands of the general public as possible. (Sheehy Decl. ¶ 10 (conceding that New.net's "success depends on its ability to distribute as many copies of the New.net Software as possible.")). How that is done is at the heart of the present dispute. New.net attempts to realize its objective by surreptitiously "bundling" NewDotNet with other popular software programs, a process by which an individual who intentionally requests and downloads certain desired software actually gets a bundle of other software that was not sought by the user.[2]

### 2. Lavasoft and Its Ad-aware Software

Defendant Lavasoft/Nicolas Stark Computing, AB is a public information service which began as a project to bring public notice to the fact that unwanted software applications were being downloaded onto personal computers without the user's knowledge or consent. To this end, Lavasoft developed a software program, Ad-

---

**2.** NewDotNet is sometimes introduced to users' computers without any notice or consent because NewDotNet is silently bundled with another program. At other times, its presence is "disclosed" deep within complicated user agreements that do not allow users

to opt out of downloading the bundled conglomeration. This Court's prior order contains a more detailed description of New.net's distribution methods. (11/04/03 Order at 8–12).

aware, which is available for free on the internet, with enhanced versions also available for sale. Ad-aware is enormously popular and one of the most downloaded software applications on the internet. (*See* August 22, 2003 Amabile Decl. ¶ 4 ("Ad-aware is the eighth most downloaded software application with over 270,000 downloads in the week of August 17, 2003 alone, and more than 19 million downloads in total.")). Lavasoft's homepage describes Ad-aware as a program that "detect[s] and remove[s] the worst that the Internet and shareware/ freeware have to offer" and gives the user information regarding programs, that without the user's knowledge or permission, are downloaded onto the user's computer and can effect the computer's operation, and tells the user that Ad-aware can keep the user's computer or network free of compromising and intrusive threats to privacy. (8/25/03 Sheehy Decl. Exh. B).

Ad-aware functions as follows: it performs a scan of the user's computer, detects specific programs on a user's personal computer, alerts the user to their presence with a text box providing a cryptic description of the programs, asks the user if they wish to delete identified programs, and, if prompted, removes unwanted applications from the user's computer. Ad-aware does not tell a user to remove a program. Nor does it delete a program unless the user decides to exercise that option. Rather it empowers the user with the choice of uninstalling the program or keeping it. New.net's complaint concedes this point, stating on more than one occasion that "Ad-aware gives the users the option to remove" a program. (Compl. at ¶¶ 10, 24).

Lavasoft relies on reviews of submissions from the public and other sources of publicly available information in order to make a determination as to whether certain software programs should be included in the Ad-aware database. NewDotNet is one of the programs that Ad-aware identifies and, if directed, assists the user in deleting. NewDotNet is included in the Ad-aware database because of its purported negative impact on internet connectivity and its surreptitious method of distribution—both of which are topics of discussion in the internet privacy community on sites which refer to NewDotNet as commercial "foistware" and discuss various system problems associated with NewDotNet.

### B. THE PENDING MOTION

Although Lavasoft won a decisive victory in defeating Plaintiff's attempt to obtain a preliminary injunction in this case, New.net has continued its pursuit of this lawsuit. Accordingly, Defendants Lavasoft and Nicolas Stark Computing AB (hereinafter "Defendant") now move to strike, pursuant to California's anti-SLAPP statute, Plaintiff's causes of action for (1) unfair competition; (2) trade libel; (3) and tortious interference with prospective economic advantage. Defendant also seeks judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) as to Plaintiff's federal Lanham Act false advertising claim. Finally, because the only remaining claim—Plaintiff's claim for declaratory relief—is intertwined with and dependent on the other claims for relief, Defendant seeks dismissal of that claim as well.

The Court's November 4, 2003, ruling on New.net's motion for preliminary injunction distills the essence of the present dispute and describes the foundation of the Court's ruling, which applies on this motion as well. There the Court wrote:

> New.net brings this suit ... to protect its ability to surreptitiously download its New.net software by silencing a company whose computer program, **at the request of the computer owner,** calls attention to NewDotNet's presence on the

user's hard drive. Correctly understood, the contest in this case is between computer users, who acquire software precisely to determine what programs they may have unsuspectingly downloaded onto their hard drives, and New.net, which apparently needs the ability to deliver its program to as many unwitting users as possible to further its business plan.

(Order at 2) (emphasis in original). This Court noted, among other things, that New.net present[ed] no persuasive evidence that any of Lavasoft's statements are false, (Order at 3), and that "Lavasoft's speech addresses a matter of legitimate public concern." (Order at 21). Accordingly, as explicated more fully below, the Court **GRANTS** Defendant's motion in its entirety, and orders the present lawsuit **DISMISSED WITH PREJUDICE.**

## II.

## DEFENDANT'S MOTION TO STRIKE SHOULD BE GRANTED

### A. LEGAL STANDARD FOR A SPECIAL MOTION TO STRIKE

In 1992, responding to the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," the California Legislature enacted the Anti–Strategic Lawsuit Against Public Participation (anti-SLAPP) statute. CAL. CIV. PROC. CODE § 425.16(a). The statute was intended to "encourage continued participation in matters of public significance" and to prevent the chilling of such participation "through abuse of the judicial process. *Id.* To that end, the statute directs courts to construe the statute broadly." *Id.*

The statute is designed to allow for early dismissal of non-meritorious cases aimed at chilling First Amendment expression through costly, time-consuming litigation. Under the statute, a civil defendant, at the infant stages of the litigation, may move to strike a plaintiff's SLAPP complaint, which is defined as a non-meritorious action brought against a person arising "from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." CAL. CIV. PROC. CODE § 425.16(b)(1).

■ A court considering an anti-SLAPP motion must engage in a two-part inquiry. First, in order to prevail on a motion to strike, the moving party must make an initial prima facie showing that the claimant's suit arises from an act in furtherance of its rights of petition or free speech in connection with a public issue. *Wilkerson v. Sullivan,* 99 Cal.App.4th 443, 446, 121 Cal.Rptr.2d 275 (2002) (citing *Dowling v. Zimmerman,* 85 Cal.App.4th 1400, 1414, 103 Cal.Rptr.2d 174 (2001)); *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1109 (9th Cir.2003). "An act in furtherance" includes, but is not limited to, "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or any other conduct in furtherance of the exercise of ... the constitutional right of free speech in connection with a public issue or an issue of public concern." CAL. CIV. PROC. CODE § 425.16(e)(3).

■ Second, once the defendant has made a prima facie showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims. *Vess,* 317 F.3d at 1109. To do this, the plaintiff must demonstrate that "the complaint is legally sufficient and supported by a prima facie showing of *facts* to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Wilcox v. Superior Court,* 27 Cal. App.4th 809, 823, 33 Cal.Rptr.2d 446 (1994) (emphasis added) (overruled on other grounds).

This burden is "much like that used in determining a motion for nonsuit, directed verdict, or summary judgment." *ComputerXpress, Inc. v. Jackson,* 93 Cal. App.4th 993, 999, 113 Cal.Rptr.2d 625 (2001). Thus, a defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or "when no evidence of sufficient substantiality exists to support a judgment for the plaintiff." *Id.* at 828, 33 Cal. Rptr.2d 446. In making this determination, the court is to consider the pleadings, and supporting and opposing affidavits stating the facts upon which liability is premised. CAL. CIV. PROC. CODE § 425.16(b)(2).

### B. THE SPECIAL MOTION TO STRIKE DOES NOT VIOLATE THE ERIE DOCTRINE

Defendant properly directs its anti-SLAPP motion only to the pendant state law claims set out in the Complaint. Because *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which was initially formulated in diversity cases, applies as well to pendant state law claims in federal question cases, *see Nathan v. Boeing Co.,* 116 F.3d 422, 423 (9th Cir.1997), the Court must first consider whether to apply this unique state procedure in this action. That determination turns on whether application of the state procedural rule would result in a "direct collision" with a Federal Rule of Civil Procedure. *Walker v. Armco Steel Corp.,* 446 U.S. 740, 749–50, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980). Where no such collision exists, application of the state rule should be applied to accomplish the "twin aims" of the Erie principle—the discouragement of forum shopping and the equitable administration of the laws. *Hanna v. Plumer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

This circuit has addressed the applicability of the anti-SLAPP statute in federal question cases in *United States v. Lock-heed Missiles & Space Co., Inc.,* 190 F.3d 963, 970–73 (9th Cir.1999), in which the Court concluded that subsections (b) and (c) of the anti-SLAPP statute may be applied to pendant state law claims without running afoul of Federal Rules 8, 12 and 56. In response to the contention that the anti-SLAPP legislation "directly conflicted" with those rules, the Court concluded:

> [T]wo aspects of California's Anti-SLAPP statute are at issue: the special motion to strike, Cal. Civ. P.Code § 425.16(b), and the availability of fees and costs, Cal. Civ. P.Code § 425.16(c). We conclude that these provisions and Rules 8, 12, and 56 'can exist side by side ... each controlling its own intended sphere of coverage without conflict.' *Walker v. Armco Steel,* 446 U.S. at 752, 100 S.Ct. 1978, 64 L.Ed.2d 659.

*Id.* at 972. The Court further noted:

> Although Rules 12 and 56 allow a litigant to test the opponent's claims before trial, California's "special motion to strike" adds an additional, unique weapon to the pretrial arsenal, a weapon whose sting is enhanced by a[n] entitlement to fees and costs. Plainly, if the anti-SLAPP provisions are held not to apply in federal court, a litigant interested in bringing meritless SLAPP claims would have a significant incentive to shop for a federal forum. Conversely, a litigant otherwise entitled to the protections of the anti-SLAPP statute would find considerable disadvantage in a federal proceeding. This outcome appears to run squarely against the "twin aims" of the Erie doctrine.

*Id.* at 973. *See also* Rutter Group, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, at 1:63.6 (2004) (describing the anti-SLAPP statute as establishing a rule of "substance" and not "procedure"). Thus, under controlling precedent, the *Erie* doctrine permits the Court to consider Defendant's special mo-

tion to strike under California's anti-SLAPP statute since, to do otherwise, would encourage forum shopping by providing plaintiffs with a federal forum where they could bring bogus SLAPP suits.

Plaintiff complains that Defendant's motion suffers from two procedural flaws, one that potentially implicates *Erie* and one that does not. First, Plaintiff argues that permitting Defendant to move to strike would deny Plaintiff the opportunity to conduct discovery, potentially placing the statute in conflict with Rule 56(f), which precludes motions for summary judgment upon a showing that additional, relevant discovery may create a genuine issue of material fact for trial. Second, Plaintiff argues that the motion should be denied because Defendant failed to comply with the requirement that the special motion should be made within 60–days of the filing of the complaint.[3] The Court will take up the 60–day rule first, and then the discovery argument.

### 1. The Court May Consider anti-SLAPP Motions Made Later Than 60 Days From the Filing of the Complaint

■ The anti-SLAPP statute provides that a defendant may file an anti-SLAPP motion "within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper." CAL. CIV. PROC. CODE § 425.16(f).[4] Plaintiff argues that Defendant filed its motion too late and that because Defendant was required to seek leave of the Court to file its untimely motion prior to

filing, the motion must be denied. (Opp. at 5). Moreover, Plaintiff insists that leave should not be granted because there is no excuse for Defendant's delay in filing when it had prepared the motion and attached it to its opposition to the motion for a preliminary injunction. (*Id.*). Defendant acknowledges that more than sixty days have elapsed since the filing of the complaint in this matter, but in its motion to strike, requests permission to file its untimely anti-SLAPP motion. (Mot. at 1).

Because this case has not proceeded in any material respect with the exception of litigating Plaintiff's motion for a preliminary injunction, the filing of this anti-SLAPP motion after the sixty-day period does not frustrate the anti-SLAPP statute's purpose of disposing of improper lawsuits in the early stages of the proceedings. Nor is Plaintiff prejudiced because, as Plaintiff admits, it was in possession of the motion when it received Defendant's opposition to the motion for a preliminary injunction. Thus, Plaintiff has been long aware of both Defendant's intent to file the motion and of the motion's content.

Here, the Court concludes that the delay in filing reflects prudence on the part of Defendant because the Court's ruling on Plaintiff's motion for a preliminary injunction would, in most instances, have resulted in the voluntary dismissal of the lawsuit. Indeed, Defendant contends that in light of this Court's prior ruling, it delayed the filing of the anti-SLAPP motion in the hope that Plaintiff might appreciate the lack of merit in its lawsuit. (Reply at 2).

---

**3.** The Court notes that Plaintiff is simultaneously advancing two contradictory positions. On the one hand, Defendant's motion was filed too late and therefore should be denied. On the other hand, Plaintiff also argues that Defendant filed its motion too soon because discovery has not yet been had in this matter. The Court concludes that neither position is meritorious.

**4.** As discussed below, the anti-SLAPP statute's expedited procedure does not implicate the *Erie* Doctrine in this matter. Moreover, by Plaintiff's own assertions, this expedited procedure has been delayed because Defendant's motion was filed more than sixty days after the filing of the complaint, thereby vitiating any *Erie* concerns implicated by sixty-day rule.

It was not until Plaintiff appealed this Court's ruling, indicating Plaintiff's intention to continue its aggressive pursuit of this lawsuit, that the filing of the instant motion became necessary. (*Id.*). Furthermore, because this Court's ruling with regard to the motion for a preliminary injunction provides much of the basis for Defendant's motion, the delay is excusable. Accordingly, the Court exercises its discretion and permits Defendant to proceed with this motion without first seeking leave to refile it.

### 2. The Erie Doctrine Does Not Demand the Completion of Discovery Prior to Ruling on Defendant's Motion

#### (a) CCP 425.16(g) and Rule 56

■ Subsection 425.16(g) provides that the filing of an anti-SLAPP motion automatically stays all further discovery until the court rules on the motion. The court, however, "on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision." CAL. CIV. PROC. CODE § 425.16(g). Thus, at least on its face, this section would seem to be entirely consistent with Rule 56(f), which provides that:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Both statutes confer discretion on the trial court to permit discovery in the face of a dispositive motion, in the appropriate case and upon a proper showing. Thus, a comparison of the text of the two rules would seem to suggest that the anti-SLAPP statute and Rule 56 do not "directly conflict."

One case from this district has reached a contrary conclusion, based its view of the

Supreme Court's interpretation of Rule 56. *Rogers v. Home Shopping Network*, 57 F.Supp.2d 973, 979–80 (C.D.Cal.1999). Rogers was cited with favor in a subsequent Ninth Circuit decision which noted that the Supreme Court has held that a Rule 56(f) motion must be granted "where the nonmoving party has not had the opportunity to discover information that is ***essential to its opposition.***" *Metabolife Int'l, Inc.*, 264 F.3d 832, 846 (9th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (emphasis added). A recent Ninth Circuit decision also recognized that, in connection with proceedings under the anti-SLAPP statute, the court may permit specified discovery on noticed motion and for ***good cause shown.*** *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003).

■ This Court sees very little difference in the principles enunciated in the text of the two rules, or in their interpretation. By the inclusion of the phrase "essential to its opposition," the *Liberty Lobby* case seems clearly to impose a requirement on the opponent of a summary judgment motion to make a showing of need before the motion will be granted. Indeed it has been so interpreted in this circuit in cases holding that a properly supported Rule 56(f) motion requires more than a perfunctory assertion that the party cannot respond because it needs to conduct discovery.

> References in memoranda and declarations to a need for discovery do not qualify as motions under Rule 56(f). Rule 56(f) requires affidavits setting forth the particular facts expected from the movant's discovery. Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment.

*Brae Transportation, Inc. v. Coopers & Lybrand,* 790 F.2d 1439, 1443 (9th Cir. 1986). The opposing party must explain with particularity why it is unable to oppose the motion, state with specificity what facts it intends to seek through discovery, and show how its discovery efforts are reasonably expected to create a triable issue. *See In re Silicon Graphics Litigation,* 183 F.3d 970, 989 (9th Cir.1999); *Keebler Co. v. Murray Bakery Products,* 866 F.2d 1386, 1389 n. 5 (Fed.Cir.1989).

In this Court's view, these cases require a showing of "good cause"—appropriate to the particular circumstances of a Rule 56 motion—to obtain more time to conduct discovery. Thus, this Court sees no inherent "direct collision" between the expedited procedure contemplated in the anti-SLAPP statute, and the provisions of Rule 56. Indeed, to find such a collision would undermine the holding in *Lockheed Missiles* permitting the use of the anti-SLAPP procedure in federal court. Since the very objective of the procedure is to permit early resolution of claims designed to chill the exercise of First Amendment rights, any holding that would, in effect, convert the statute into a variant on Rule 56 would undermine the statute's purposes and would promote the kind of forum shopping decried in *Lockheed Missiles.* Nevertheless, the Court will review the record to determine whether an actual collision exists in this case.

### (b) There Is No Potential For Conflict In This Case

Even if the Court concluded that Section 425.16(g) and Rule 56 were potentially in conflict, the potential for a direct collision has not materialized because Plaintiff has not demonstrated that discovery is essential to its opposition nor has Plaintiff shown good cause as to why discovery should be permitted.

Although Plaintiff has sought to defer this motion pending discovery, it has not stated with any degree of specificity what discovery it needs or how that discovery would bear on this motion. Plaintiff's opposition generally refers to matters such as learning about Lavasoft's business plan, its sales and revenue, its motives and reasons for "targeting" New.net and other entities, the un-installation function of Ad-aware, the basis for labeling NewDotNet as a "data miner" or "misc.," and Lavasoft's customer base. (Opp. at 6). To the extent that the proposed discovery would contain any relevant information, most of it is already known to Plaintiff. (*See e.g.,* 11/06/03 Order at 8–9 n. 7 (noting that although New.net claims to be puzzled as to why Lavasoft might wish to scan for New.net's software, New.net cannot be truly unclear as to Lavasoft's position given the responses to New.net's counsel before the suit was filed)). But most of the information sought—business plans, sales and revenue—has little bearing on the issues raised in this motion. Plaintiff's complaint focuses on what Lavasoft did, not so much on why it did it. Moreover, Plaintiff's argument—that because of the functionality of the parties' programs, the consumer perceptions of Lavasoft's advertising message are subject in large part to expert proof, requiring the Court to defer deciding the motion until expert discovery has been conducted—is wholly unsupported. In short, Plaintiff has failed to persuade the Court that discovery is essential to its opposition to Defendant's motion.

### C. Defendant's Motion Is Not Improper Under Cal. Civ. Proc. Code § 425.17

█ Plaintiff next argues that under recently enacted section 425.17, this case is excluded from the anti-SLAPP procedure. (Mot. at 6). Section 425.17 was enacted in 2003 and no reported cases exist to assist the Court in its interpretation of the statute. Accordingly, Plaintiff's argument

presents an issue of first impression to this Court.

Due to abuses of California's anti-SLAPP law, which has undermined the very constitutional rights section 425.16 was designed to protect, the California legislature enacted section 425.17, rendering section 425.16 inapplicable to certain actions. CAL. CODE. CIV. P. § 425.17(a). Section 425.17(c)(1) provides that section 425.16 no longer applies to:

> (c) [A]ny cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person *if both of the following conditions exist:*
>
> > (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services.
> >
> > (2) The intended audience is an actual or potential buyer or consumer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer ... notwithstanding that the conduct or

statement concerns an important public issue.

CAL. CIV. PROC. CODE § 425.17(c)(1)(2) (emphasis added). For the reasons discussed more fully below, Plaintiff's case does not fall within the ambit of section 425.17(c)(1)'s protection. As sections 425.17(c)(1) & (2) are conjunctive and Plaintiff is unable meet the conditions of section 425.17(c)(1), the Court will not address whether or not Plaintiff could satisfy the requirements of section 425.17(c)(2).[5]

**1. *Lavasoft Is Not Primarily Engaged in the Business of Selling Goods***

As a threshold matter, to satisfy section 425.17, Plaintiff must show that Defendant is "primarily engaged in the business of selling or leasing goods or services." *Id.* § 425.17(c). Plaintiff asserts that Defendant is "primarily engaged in the business of selling Ad-aware and other products" based on the fact that Defendant purports to admit that it operates a business and sells software products. (Opp. at 7).

Just because Defendant operates a business and sells software products, does not mean that Defendant is *primarily* engaged in the business of selling goods. In fact, in addition to providing a public service, it is not seriously disputed that a bulk of Defendant's business involves giving away, not selling, its goods. (*See* August 22, 2003 Amabile Decl. ¶ 4 ("Ad-aware is the eighth most downloaded software application with over 270,000 downloads in the week of August 17, 2003 alone, and more than 19 million downloads in total.")).[6]

---

5. The Court declines to engage in unnecessary interpretation or application of section 425.17 because, as already discussed, this section has yet to be interpreted by any California court. Accordingly, informed by principles of federalism, the Court concludes that it should avoid any unnecessary construction of the newly enacted statute.

6. Plaintiff, in oral argument and its motion, insists that Defendant's enormous popularity

is due to its aggressive marketing campaign which includes the making of purported libelous advertising type statements about the nature of Plaintiff's software. Plaintiff, however, has adduced no evidence that Defendant's success is due to any such marketing. Furthermore, the Court notes the possibility that companies can experience great success and create substantial interest in their products with little to no marketing by simply filling an empty niche in the marketplace.

In an attempt to show that Defendant primarily engages in the business of selling products, Plaintiff refers to Defendant's website which posts job listings for sales assistants and other sales positions. (Opp. at 8). In an analogous context, however, the Consumer Reports website also lists a number of positions related to sales and/or servicing Consumer Reports customers and the website further lists various products for sale such as its well-known magazine subscription and internet version of that subscription. (Scarola Decl. to Reply Exh. B). Thus, if the Court adopted Plaintiff's construction, Consumer Reports would be "primarily engaged in the business of selling ... goods or services," thus making Consumer Reports ineligible for the protection of the anti-SLAPP statute. The Court cannot and does not adopt such an untenable interpretation of California's newly enacted statute.

### 2. Lavasoft Is Not Making Statements About Its Own Product nor Is New.Net Lavasoft's Business Competitor

In order to satisfy the required conditions of section 425.17(c), Plaintiff must also show, pursuant to section 425.17(c)(1), that Defendant is making statements about its own product or a competitor's business operations, goods or services. First, according to Plaintiff's complaint the purportedly offending statements are not statements made about Defendant's product, but rather statements about Plaintiff and its products. Thus, under the facts present in this case, section 425.17 requires that the parties be competitors. Section 425.17 was adopted in 2003 and there are no reported cases discussing what "competitor" means. The definition of "competitor" in Webster's Dictionary, however, is a "rival" or "one selling or buying goods or services in the same market as another." Webster's Ninth New Collegiate Dictionary 268 (9th ed.1991); (Scarola Decl. to Reply Exh. C ¶ 4). For the reasons discussed *infra* in the analysis of Plaintiff's Lanham Act claim, Plaintiff's argument that Defendant is a competitor is without merit.

### 3. Lavasoft's Purported Statements Were Not Made in the Course of Delivering Goods

Next, Defendant's statements about Plaintiff were not made in the course of delivering goods, but were made after the good, *i.e.* Ad-aware, was downloaded and operational. The plain facts are that specific references to NewDotNet did not occur until after Ad-aware was downloaded by the computer user and in use. Indeed, Plaintiff concedes that "access to Ad-aware statements is selective because such statements are generally viewable only by those who download or purchase one of the Ad-aware products." (Opp. at 10).

Nevertheless, Plaintiff argues that Defendant's statements that induce a user to download Ad-aware in the first place are actionable because they falsely associate Plaintiff with the "worst of the worst" on the internet. As the Court noted in its denial of Plaintiff's request for preliminary injunction, to the extent that Plaintiff's software has been associated with insidious downloaded programs, New.net itself bears responsibility for that association by allowing its software to be bundled with some of the most invasive spyware and track-ware programs on the internet. But, in reality, nothing on Lavasoft's web page even mentions New.net or its software, let alone associates it with questionable downloaded programs. Rather, Lavasoft's homepage generally explains that its software is designed to give computer user's information regarding programs that, ***without the user's knowledge or permission,*** are downloaded onto the

user's computer and can effect the computer's operation, and tells the user that Ad-aware can keep the users' computer or network free of compromising and intrusive threats to privacy. (8/25/03 Sheehy Decl. Exh. B). Lavasoft's website does not mention Plaintiff either directly or indirectly.

Finally, even if New.net's software had been mentioned on the site, the undisputed facts establish that it could legitimately be described as a surreptitiously downloaded program. Although Plaintiff has repeatedly asserted that only those who want New.net's software receive it, a few moments of reflection suggests that if this assertion were true, there would be no reason for this lawsuit. If a computer user desired NewDotNet, actively sought it out, knew of the nature of the software, and affirmatively chose to download it on their computers, Ad-aware's notification of its presence would merely advise the user of what he or she already knew. Because Ad-aware does not remove any program without direction from the user, the user who had requested NewDotNet would have no reason to delete it merely because Ad-aware alerted the user to the program's presence. In fact, Defendant poses a threat precisely because NewDotNet is downloaded without the user's knowledge or informed consent, and so advising a computer user of that fact, especially after the download has occurred, falls outside the scope of section 425.17. Accordingly, section 425.17 does not prevent Defendant from filing this anti-SLAPP motion.

**D. THE REQUIREMENTS OF CALIFORNIA'S ANTI-SLAPP STATUTE ARE SATISFIED**

**1. Defendant Has Satisfied Its Threshold Burden [7]**

**(a) Defendant's Speech Addresses a Matter of Public Interest**

██ First and foremost, this Court has already ruled that this case involves important First Amendment issues and that Defendant engages in legitimate protected speech in connection with the public issue of surreptitiously downloaded computer programs. (Order at 3 (stating that Defendant's speech "addresses a matter of public interest")); (Order at 16 (stating that "Ad-aware constitutes speech on an issue of public importance")); (Order at 21 (stating that "Lavasoft's speech addresses a matter of legitimate public concern")); (Order at 21–22 (stating "Lavasoft's speech touches on issue of public concern regarding various aspects of the internet")); (Order at 24 (finding that because the disputed content of the software addresses a subject of public importance and debate, it is entitled to full First Amendment protection)).

Lavasoft had its genesis in a project to notify the public that unwanted software applications were being downloaded to personal computers without the user's knowledge or consent. (Akerlund Decl. Exh. B to Mot. ¶ 6). Relying primarily on submissions from the public, Lavasoft receives information through the internet and other sources to program Ad-aware. (*Id.*). Lavasoft reviews publicly available information and makes a determination as

---

**7.** After the hearing on this matter, Plaintiff submitted two newly decided cases—*Scott v. Metabolife International, Inc.*, 115 Cal.App.4th 404, 9 Cal.Rptr.3d 242 (2004) and *Rezec v. Sony Pictures Entertainment, Inc.*, 116 Cal. App.4th 135, 10 Cal.Rptr.3d 333 (2004)—for the proposition that advertising is not protected speech and therefore fails to satisfy the

first prong of California's anti-SLAPP statute. Both cases are factually distinguishable from that at bar because, as discussed more fully below, Defendant's speech is not advertising and addresses a matter of concern. Thus, these authorities are inapposite and do nothing to alter the Court's analysis.

to whether that information supports inclusion of a particular program in its database. (*Id.*) Ad-aware is, in this way, a service akin to Consumer Reports and other consumer information databases, but in a new form. (*Id.*).

Lavasoft contends that, because unscrupulous businesses have devised sophisticated means for using the internet to download their software to personal computers without informed consent, the subject of internet and computer privacy and the integrity and safety of one's personal computer has become a matter of serious concern in recent years made all the more important by the increasing reliance of computers by a large segment of the population in their daily lives. (Mot. at 6). Thus, the program itself is analogous to a newspaper, magazine, or other material that addresses a matter of public importance. Defendant's position is supported by the evidence, much of which was submitted by Plaintiff in support of its effort to obtain a preliminary injunction.

Plaintiff offered in support of the motion for a preliminary injunction the Simonds Declaration, which presents as exhibits, correspondence between the parties leading up to this lawsuit. Included in that correspondence are attachments from internet sites on which problems associated with NewDotNet are discussed. (*See* 11/4/03 Order at 12 for Examples). If ever any question existed as to the extent to which Defendant's speech deals with an issue of public importance, these attachments confirm that there is indeed a community concerned with internet privacy, that the subject is a matter of public dis-

cussion, and that Plaintiff's surreptitious downloads are a topic of discussion and concern in that context. Adding further credence to this view, the record includes evidence of complaints regarding "connectivity" associated with NewDotNet that were raised by users and various software reviewers such as Microsoft. These materials were also offered in support of the motion for a preliminary injunction to illustrate that Plaintiff has been dealt severe blows to its reputation. (*Id.* at 12). All of the statements contained in these materials were made by entities or individuals other than Defendant. Thus, much of the offensive speech with which Plaintiff takes issue is not Defendant's speech, but speech engaged in by numerous others in the internet community including individual computer users. Because Plaintiff cannot silence these critics, it has attempted instead to gag Defendant. The effort, however, instead demonstrates the public importance of the issues that are the focus of Defendant's software. Because the issue of public awareness of, and protection from, the unknown are at the heart of the public information service Defendant provides and because that service is of public significance, speech in this area should not be chilled by litigation brought by Plaintiff who seeks to stifle speech to enhance its profits.

### b. Defendant's Speech Took Place in a Public Forum

 Plaintiff argues that Defendant's statements were not made in a place open to the public or a public forum because the statements are only viewable to those who download or purchase the product, and therefore it is a place of selective access. (Opp. at 10).[8] The Court disagrees.

---

**8.** Plaintiff also attempts to now argue that Defendant's speech is not speech at all, but conduct. (Opp. at 10). To buttress this assertion, Plaintiff argues that Defendant "encourages" users to uninstall New.net and provides them with the ability to do so. (*Id.*). Although the Court concludes that Defendant

does not "encourage" users to delete programs from their hard drive, but rather merely gives them the option to delete or retain programs, Plaintiff's use of the word "encourages" undermines the argument that Defendant does not engage in speech. The very fact that Plaintiff could not find a better

Cases construing the term "public forum" as used in section 425.16 have noted that the term is "traditionally defined as a place that is open to the public where information is freely exchanged." *ComputerXpress, Inc.*, 93 Cal.App.4th at 1006, 113 Cal.Rptr.2d 625 (quoting *Damon v. Ocean Hills Journalism Club*, 85 Cal.App.4th 468, 475, 102 Cal.Rptr.2d 205 (2000)). "Under its plain meaning, a public forum is not limited to a physical setting, but also includes other forms of public communication such as electronic communication media like the internet." *ComputerXpress, Inc.*, 93 Cal.App.4th at 1006, 113 Cal. Rptr.2d 625 (citing *Hatch v. Superior Court*, 80 Cal.App.4th 170, 79 Cal.App.4th 663, 94 Cal.Rptr.2d 453 (2000)) (noting, although not in the context of section 425.16, that internet communications have been described as "classical forum communications").

Defendant's speech about Plaintiff is made in Defendant's Ad-aware software which is available and distributed free of charge and downloaded by millions of computer users via Defendant's website and other linked websites. In similar circumstances, it has been held that a website that is accessible free of charge to any member of the public, which provides a forum where members of the public may read the views and information posted, and also post their opinions on the site is deemed to be a public forum. *Global Telemedia Intern., Inc. v. Doe 1*, 132 F.Supp.2d 1261, 1264 (C.D.Cal.2001). This is the case because such websites satisfy the requirement that a public forum be "a place open to the public where information is freely exchanged." *Damon*, 85 Cal. App.4th at 475, 102 Cal.Rptr.2d 205.

In fact, the California Court of Appeal decided on January 21, 2004, that the contention that the internet is not a public forum is a peculiar contention that is difficult to take seriously. *Barrett v. Rosenthal*, 114 Cal.App.4th 1379, 9 Cal.Rptr.3d 142, 148–48 (2004). The court observed that the internet is a decentralized, global medium of communication that links people, institutions, corporations and governments around the world. *Id.* (citing *ACLU v. Reno*, 929 F.Supp. 824, 831 (E.D.Pa.1996)). Indeed, the U.S. Supreme Court theorized in affirming the *Reno* decision that the internet:

> Provides relatively unlimited, low-cost capacity for communication of all kinds ... This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue. Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer.

*Reno v. ACLU*, 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Considering that the internet provides "the most participatory form of mass speech yet developed," *Reno*, 929 F.Supp. at 883, it is not surprising that courts have uniformly held or, deeming the proposition obvious, simply assumed that internet venues to which members of the public have relatively easy access constitute a "public forum" or a place "open to the public" within the meaning of section 425.16. *Barrett*, 9 Cal.Rptr.3d at 149 (2004) (citing

---

choice of words to describe Defendant's "conduct" illustrates that perhaps there is no way to construe Defendant's activity as anything other than speech. Moreover, the complaint acknowledges several times that Ad-aware

merely gives users the "option to remove" NewDotNet, although that option is alleged to implicitly communicate that the user should delete it. (*See, e.g.,* Compl. ¶ 24).

*ComputerXpress, Inc.,* 93 Cal.App.4th at 1007, 113 Cal.Rptr.2d 625; *Global Telemedia Intern., Inc. v. Doe,* 132 F.Supp.2d 1261, 1264 (C.D.Cal.2001); *Nicosia v. De-Rooy,* 72 F.Supp.2d 1093 (N.D.Cal.1999)).

The fact that computer users must download the software to read the speech provides no reason to ignore the self-evident truth that Defendant's speech occurred in a public forum. Moreover, Plaintiff does not solely complain of the speech that occurs once the user has downloaded the program for free or purchased the program. Plaintiff argues that the statements that induce a user to download the software are actionable because they falsely associate Plaintiff with insidious programs. Therefore, by Plaintiff's own contentions, speech is implicated that occurs before the user engages in any downloading or purchasing. Thus, by Plaintiff's own allegations, the access to the speech is not selective or limited. Additionally, Defendant has chat rooms which are an open forum permitting Ad-aware users, or even internet users in general, to discuss the benefits and disadvantages of various software, including Ad-aware and NewDotNet.

Accordingly, Defendant has made the required threshold showing that the statements about which Plaintiff complains were statements made in a place open to the public or a public forum in connection with an issue of public concern or in furtherance of Defendant's right of free speech under the United States or California Constitution, and were therefore within the ambit of the protection afforded by section 425.16. The burden, therefore, shifts to Plaintiff to demonstrate a probability of success on its claims.

**2. *Plaintiff Cannot Establish a Likelihood of Success on the Merits***

New net complains that Ad-aware's inclusion of NewDotNet in its database constitutes: (1) unfair competition in violation of Cal. Bus. & Prof.Code § 17200, (2) trade libel, (3) interference with prospective economic advantage, and (4) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and prays for injunctive and declaratory relief. Plaintiff's claims are stacked like a house of cards, each relying on the other for its support. A determination that one claim is not viable undermines the viability of the remaining causes of action. Thus, the facts advanced in support of each claim are similarly intertwined and overlapping. The salient facts are as follows:

In support of its claims, Plaintiff asserts that Defendant falsely labels it as a "data miner" and prompts the user to remove it. (*See, e.g.,* Compl. ¶ 24; Opp. at 16). Plaintiff, pointing to the Akerlund Declaration filed in support of the instant motion, argues that Defendant concedes that NewDotNet is not a data miner. (*Id.*). Defendant, however, does not admit that NewDotNet is not a data miner; it takes no position on the issue. While Defendant, in the Akerlund Declaration, does admit that an earlier version of Ad-aware labeled NewDotNet as a "data miner," and that such a label was an unintended aberration, this does not amount to proof that the label was false. (Akerlund Decl. ¶ 26). Moreover, subsequent versions of Ad-aware place it in the non-pejorative category—"misc." As for the truth or falsity of the data miner label, the only evidence proffered by Plaintiff in support of its claim of falsity are two declarations that simply state that neither the "data miner" nor the "misc." labels are properly descriptive of NewDotNet. (Sheehy Decl. ¶ 14; Amabile Decl. ¶ 6).[9] The Court, in

---

**9.** Plaintiff also argues that Defendant's own experts concluded that Plaintiff's software was benign. (Opp. at 18 (citing 8/22/03 Amabile Decl. ¶¶ 11–15)). These experts are for-

mer employees of Defendant. (Akerlund Decl. ¶ 14). This Court, during oral argument on the motion for a preliminary injunction,

ruling on Plaintiff's motion for a preliminary injunction commented that "New.net present[ed] no persuasive evidence that any of Lavasoft's statements are false." (11/04/03 Order at 3). Nothing has changed.

Plaintiff also complains that Ad-ware's flawed uninstall feature may totally and perhaps irredeemably sever connectivity—a flaw which Plaintiff asserts has dealt a severe blow to its reputation with users. (Compl. at 2). Ad-aware does not clearly deny that its method may at one time been flawed, but asserts that the "current, and only, version distributed by Defendant today has never been the subject of such a claim." (Akerlund Decl. ¶ 30). Indeed, Plaintiff has never established that any currently distributed versions of Ad-aware cause connectivity problems when a user attempts to remove NewDotNet. Moreover, regardless of Ad-aware's uninstallation flaws, Microsoft and other software reviewers have noted that NewDotNet itself may cause serious system problems such as crashing Internet Explorer or causing loss of all network connectivity when users attempt to upgrade their operating systems or to remove it with its own uninstallation mechanism. (*Id.* ¶¶ 15–18; Exhs. I–P thereto).

Plaintiff also contends that, because Defendant targets malicious advertising programs, the mere inclusion of NewDotNet on its target list unfairly associates the program with the "worst of the worst" on the internet, when in reality, it is functionally benign and a beneficial enhancement for internet browsing. (Compl. ¶ 27; Sheeny Decl. ¶¶ 4–6, 12). However, noticeably absent from Lavasoft's homepage is any specific mention of New.net or NewDotNet of any sort, let alone the suggestion that NewDotNet is the "worst of the worst." Indeed, Plaintiff concedes that the only specific mention of NewDotNet appears after the user has downloaded and run the Ad-aware program. (*See* Opp. at 10 ("Such statements are generally viewable only by those who download or purchase one of the products.")). Ad-aware's disclosures about NewDotNet, after the download and scan are performed, merely describe it as a layered service provider and classify it as "misc." Thus, Plaintiff's assertion ignores the terms used by Ad-aware in its description of NewDotNet, and draws inferences about what users may or may not believe from Ad-aware's web page statements without providing any useful evidence on the subject.

Plaintiff's allegations also ignore its own conduct—conduct which could easily foster negative impressions of NewDotNet—which is described in internet articles submitted by Plaintiff in support of its motion for preliminary injunction. For example, one author related that "NN bundles with trash and questionable applications. In fact a few may have serious legal problems to contend with soon," and remarked that New.net has a number of problems including "bundling with so many crappy applications." (8/22/03 Amabile Decl. Exh. G). Thus, Plaintiff can hardly complain of any negative associations created by Ad-aware when its own conduct, *i.e.,* surreptitiously downloading its program onto personal computers and bundling with questionable applications, creates associations that are less than desirable.

With respect to Plaintiff's alleged damages, the complaint merely alleges "direct financial injury" without specifying the precise nature or the amount of damage.

recognized the problems inherent in the testimony of disgruntled, former employees. (Scarola Decl. to Reply Exh. A Transcript at 32). Accordingly, this evidence also is not sufficiently persuasive to satisfy Plaintiff's burden of proving a probability of success on the merits.

The complaint also fails to allege the size of Plaintiff's business, its customer base, the amount of its sales, or even if it had sales, prior to or after Defendant's allegedly harmful statements were made and published. Plaintiff's opposition and the accompanying declarations and exhibits are similarly devoid of such facts. Plaintiff's opposition, however, attempts to expand somewhat on its conclusory assertion of injury, arguing that it *may have* permanently lost end users who unfairly blame Plaintiff when Ad-aware's uninstallation process breaks the users' connections with the internet and that as a result of Defendant's targeting of Plaintiff, it has lost its business partnering contracts with Hewlett Packard. (Opp. at 20; Sheehy Decl. ¶ 16).

Plaintiff offers no facts showing the value of the lost Hewlett Packard contract. Likewise, although Sheehy asserts that some action of Defendant caused the termination of Plaintiff's contract with Hewlett–Packard, he presents no documentation to support that claim. Plaintiff presents no reason why Lavasoft would have any reason to know of any specific relationship that Plaintiff had with any third party in connection with the distribution of its software. Even Plaintiff's cease and desist letters sent to Defendant prior to the suit's filing fail to identify any third party relationships that were supposedly damaged by the Ad-aware software. (*See* Simonds Decl. Exh. A, B). Instead, the complaint focuses solely on New.net's relationships with computer users and contains no allegations that it derives *any* revenue from its distribution of NewDotNet to such users.

Plaintiff also fails to provide documentation that it suffered any damage whatsoever from Ad-aware's uninstallation process, resulting in some users' loss of connectivity which Plaintiff claims harmed its reputation by unfairly associating Plaintiff with the loss. It should be clear, however, that Plaintiff had already lost its relationship with users who experienced connectivity problems because the loss of connectivity only occurred after the user had chosen to use the Ad-aware program to delete New-DotNet from his or her computer. As for other users who learn about the relationship between NewDotNet and connectivity problems from third parties, if those statements are defamatory and damage Plaintiff's reputation, Plaintiff's complaint lies with those third parties, not Defendant. This is especially true given that some of the system problems associated with New-DotNet by third parties are unrelated to uninstallation by Ad-aware; rather, they focus on inherent defects in the NewDot-Net software. In any event, those third party statements pertaining to NewDot-Net's removal, logically, must also primarily have an effect on users who already desire to eliminate NewDotNet from their hard drives.

### (a) Plaintiff's Unfair Competition Claim

California Business and Professions Code section 17200 et seq. prohibits any person from engaging in "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." Cal. Bus. & Prof. Code § 17200.

### (i) Defendant's Speech is Not Commercial Speech but is Speech Afforded Full First Amendment Protection

■ Lawsuits premised on section 17200 are subject to being stricken because they are barred by the First Amendment where the speech complained of is not commercial speech. *Kasky v. Nike, Inc.*, 79 Cal.App.4th 165, 178, 93 Cal. Rptr.2d 854 (2000) (reversed on other grounds). As a preliminary matter, Plaintiff argues, contrary to this Court's prior

ruling, that the First Amendment does not protect Defendant's speech. (Opp. at 12). In particular, Plaintiff argues that Defendant's speech is commercial speech not entitled to full First Amendment protection. Despite Plaintiff's protests to the contrary, the Court concludes that the speech in question, which involves an identification of NewDotNet on a computer's hard drive and labels it as "misc." and gives the computer owner the option of deleting, is not commercial speech.

"[T]he category of commercial speech consists at its core of 'speech proposing a commercial transaction.'" *Kasky v. Nike Inc.*, 27 Cal.4th 939, 956, 119 Cal. Rptr.2d 296, 45 P.3d 243 (2002). Factors to be considered in that analysis are: (1) whether the statements are in a typical advertising format; (2) whether the statements refer to a commercial product; and (3) whether the defendant had an economic or commercial motivation for making the statements. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). Not all of the factors need to be present to conclude that speech is commercial, but none of these factors, in and of itself, is sufficient to support a commercial speech transaction. *Id.* at 67 n. 14, 103 S.Ct. 2875. Nor is commercial speech strictly limited to the core segment of speech that proposes a commercial transaction. *Kasky*, 27 Cal.4th at 956, 119 Cal.Rptr.2d 296, 45 P.3d 243. Speech is commercial in its content if it is likely to influence consumers in their commercial decisions. *Id.* at 969, 119 Cal.Rptr.2d 296, 45 P.3d 243. Speech is not advertising speech where it does not promote the speaker's product for sale or encourage a commercial transaction with the user. *Id.*

Here the speech that Plaintiff targets occurred after the conclusion of the "transaction" (which typically involves no exchange of money) between Lavasoft and a computer user. Accordingly, Defendant's after-the-fact statements about NewDotNet cannot relate to the "sale" of Lavasoft's Ad–Aware program or be intended to induce an economic transaction between Defendant and the Ad-aware user. The statements are similar to those that would appear in a review published in a magazine whose focus is the evaluation of consumer goods. Moreover, when users initiate the Ad-aware program, review the results of its search of the user's hard-drive and initiate the Ad-aware uninstall feature, they are not making a decision to purchase anything—rather, they are managing the content of their computer's hard drive. This is not activity that falls within the scope of Section 17200.

Similarly, the statements on Defendant's homepage focus not so much on the marketing of any particular software program (the basic Ad-aware program is given away free), but primarily on the larger issue of the surreptitious downloading of computer programs. The computer user who accesses the Lavasoft web site is provided with information regarding the means by which internet businesses access personal computers, place programs on those computers, and accomplish that goal without the user's knowledge. The site further describes how many of those downloaded programs work to track the user's internet activities and reports those activities to persons unknown to the user. The site explains how the freely available Ad-aware works, the benefits it provides, and then permits the user to download Ad-aware, or not, for free. This is not commercial speech within any commonly understood meaning of that term.

**(ii) Defendant Has Not Engaged in an Unlawful Practice**

Plaintiff argues that Defendant's speech is unlawful because it violates the Lanham Act and constitutes trade libel and tortious

interference with prospective economic advantage. (Opp. at 16). Thus, Plaintiff seeks to piggyback its unfair competition claim upon these other claims. Because the Lanham Act,[10] trade libel, and tortious interference claims are not viable, there are no independently unlawful facts upon which Plaintiff can premise its unfair competition claim.

### (iii) The Speech Was Not Fraudulent Nor Did It Involve False Advertising

■ Plaintiff argues that Defendant's statements are fraudulent and constitute a violation of the false advertising prong of section 17200. (Opp. at 16). First, despite this Court's prior ruling to the contrary, Plaintiff persists in its contention that Defendant falsely labeled NewDotNet a data miner and that Defendant conceded this point, but does so without presenting any additional support for its position. (*Id.*). To the extent that any evidence has been presented on this point, it fails to establish that the statements allegedly included in the Ad-aware software (which are no longer included) are in fact false. Because evidence proving that Plaintiff is not a data miner lies exclusively in its own hands, permitting discovery into the issue of falsity will not help Plaintiff to bolster its position.

Second, Plaintiff contends that, because Defendant holds itself out as being an expert in the internet privacy and anti-trackware industry and sends the marketing message "buy Ad-aware to remove malicious advertising programs on your computer," the inclusion of NewDotNet in its software database would lead an average person of ordinary intelligence to understand that NewDotNet is an advertising program or data miner. (Opp. at 18). The problem with the argument is that users who download Ad-aware are not provided with a listing of the programs in its database, and won't know whether anything in the database exists on their computer until after the software has been run. Thus, Plaintiff's convoluted argument that user's obtain the Ad-aware software in part because of a belief that New-DotNet is a dataminer or an advertising program will not withstand even casual analysis.

Plaintiff's argument as to defendant's supposed motivation for making these imagined "false statements" further demonstrates the lack of merit in Plaintiff's position. Plaintiff insists that NewDotNet has been included in the Ad-aware database because its inclusion furthers Defendant's economic interest by increasing the software's perceived value in the mind of the consumer, enticing more consumers to purchase the enhanced versions of Ad-aware. On that basis, Plaintiff concludes that Defendant's statements constitute advertising and that the advertising is misleading or has the capacity or tendency to deceive or confuse the public. But again, the size and content of the database are unknown to the downloader, and the inclusion of NewDotNet in Ad-aware's database will remain unknown to the user unless NewDotNet has been downloaded to the user's computer without his knowledge or consent. Thus, although Plaintiff correctly asserts that the term advertising should be interpreted broadly (*id.* at 17) (citing *Chern v. Bank of America*, 15 Cal.3d 866, 875–76, 127 Cal.Rptr. 110, 544 P.2d 1310 (1976)), no authority has interpreted the

---

10. Plaintiff argues, without citation, that even if its Lanham Act claim is dismissed for lack of standing, Plaintiff can still borrow the facts underlying the Lanham Act claim to support its unfair competition claim. Although it seems counterintuitive that an insufficient Lanham Act claim could provide a basis for another cause of action, the Court need not address Plaintiff's argument because the Lanham Act claim, as discussed more fully below, can be disposed of on its merits, rather than on standing or other prudential grounds.

term to include statements not made, or information unknown, until after a transaction has taken place. Accordingly, as the purpose of section 17200 is to prevent consumers from purchasing the product based on a seller's false statements, *Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App.4th 1073, 1078, 124 Cal.Rptr.2d 844 (2002) (Section 17200 is designed to protect "a 'singularly dense' group of customers who fall prey to misleading advertising . . . ."), logically it cannot apply in a situation where the alleged false representation post-dates the transaction. (*See* Opp. at 10 (conceding that "such statements are generally viewable only by those who download or purchase one of the products.")).

Finally, as already noted, negative descriptions of NewDotNet are included not only in the Ad-aware software, but are also disseminated by and to the general public in a wide array of other places, including internet chat-rooms and bulletin boards. Such statements by third parties certainly cannot be construed as advertising by Ad-aware.

### (b) Plaintiff's Claim for Trade Libel

Under California law, "trade libel is an intentional disparagement of the quality of property, which results in pecuniary damage." *Films of Distinction, Inc. v. Allegro Film Prod., Inc.*, 12 F.Supp.2d 1068, 1081 (C.D.Cal.1998). To prove trade libel, Plaintiff must show (1) a statement that (2) was false, (3) disparaging, (4) published to others in writing, (5) induced others not to deal with it, and (6) caused special damages. *Atlantic Mut. Ins. Co. v. J. Lamb. Inc.*, 100 Cal.App.4th 1017, 1035, 123 Cal.Rptr.2d 256 (2002); *see also Leonardini v. Shell Oil Co.*, 216 Cal.App.3d 547, 572, 264 Cal.Rptr. 883 (1989) ("A cause of action for damages for trade libel requires pleading and proof of special damages in the form of pecuniary loss.").

As for the element of falsity, as noted above, there is a dearth of persuasive evidence that Defendant made any false statement about Plaintiff's software or that it is being defamed by innuendo. (Opp. at 19–20). Additionally, Plaintiff cannot satisfy the special damages requirement for trade libel under California law. "A bare allegation of the amount of pecuniary loss is insufficient for the pleading of a trade libel claim." *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F.Supp.2d 1035, 1047 (C.D.Cal.1998). Here, Plaintiff's complaint does not even specify the amount of damage, and simply refers to an amount to be ascertained at trial. Moreover,

> [I]f the plaintiff desired to predicate its right to recover damages upon general loss of custom[ers], it should have alleged facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales subsequent to the publication, [and] facts showing that such loss in sales were the natural and probable result of such publication.

(*Id.*). Plaintiff's complaint as well as its opposition papers and accompanying declarations and exhibits contain no such factual allegations. Again, all this information is in Plaintiff's hands, so granting time to engage in discovery would be of no assistance to Plaintiff. Given that Plaintiff has failed to plead special damages, it cannot establish it has a probability of success on the merits with regard to its trade libel claim.

### (c) Plaintiff's Claim for Tortious Interference

Plaintiff also claims tortious interference with prospective business advantage, which requires a showing of: (1) an economic relationship containing the probability of future economic benefit to plaintiff; (2) knowledge by defendant of

the relationship; (3) intentional acts by the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to plaintiff proximately caused by defendant's acts. *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1429 (9th Cir.1993). Accordingly, the Plaintiff must establish that the "defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Hsu v. OZ Optics, Ltd.*, 211 F.R.D. 615, 620 (N.D.Cal.2002) (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393, 45 Cal. Rptr.2d 436, 902 P.2d 740 (1995)); *see also Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 831 n. 8 (9th Cir.2001). Stated differently, "[i]t is ... the plaintiff's burden to prove, as an element of the cause of action itself, that the defendant's conduct was independently wrongful." *Hsu*, 211 F.R.D. at 620.

 First and foremost, for reasons already articulated above, Plaintiff cannot meet this standard. In particular, Plaintiff cannot show that Defendant engaged in independently wrongful conduct.[11] Accordingly, the Court's inquiry could end here.

 Additionally, to prove this tort, Plaintiff must establish that it was reasonably probable that economic advantage would have been realized but for Defendant's interference. *Bell Atlantic Bus. Sys. Services v. Hitachi Data Sys. Corp.*, 1995 WL 798935, at *9 (N.D.Cal. Mar. 10, 1995). There is no evidence that NewDotNet's inclusion in the Ad-aware program was the cause of the loss of any contract.

(*See* Compl. ¶¶ 38–42; Opp. at 21). Indeed, the complaint focuses solely on Plaintiff's relationships with computer users. Despite the fact that the success of Plaintiff's business ultimately depends on its ability to distribute as many copies of its software as possible onto users' computers, these relationships with the public at large are based on free and usually surreptitious downloads, and thus hardly rise to the level of "economic relationships" as there is no business dealing between the unsuspecting users and Plaintiff. Moreover, the complaint is devoid of any allegation that it derives revenue from that distribution of its software.

 Finally, because the motive or purpose to disrupt an ongoing business relationship is of central concern to tortious interference cases, a strong showing of such intent is required. *Bell Atlantic Bus. Sys. Services*, 1995 WL 798935, at *9. However, as noted above, because there is no evidence that Defendant had any interest in, or any way of knowing about, Plaintiff's business operations, Plaintiff would under no circumstances be able to show that Defendant acted with the intent to disrupt any such relationships.

Finally, the Court notes that the record, including the evidence provided by Plaintiff, clearly establishes that because the tactics being used in the internet business community are a proper subject of public debate, Ad-aware is just one of a number of participants in a movement to provide information to computer users and to foster public debate on the topic.

For the foregoing reasons, Plaintiff has failed to meet its burden that it has a

---

11. Plaintiff attempts to avoid this result by engaging in tortured circular reasoning. Previously, Plaintiff argued that the section 17200 claim should be sustained because Defendant's conduct violated the Lanham Act and constituted trade libel and tortious inter-ference. (Opp. at 16). Now, Plaintiff argues that its tortious interference claim should be sustained because Defendant's conduct purportedly violates the Lanham Act and section 17200. (Opp. at 21).

probability of success on the merits of its tortious interference claim.

### (d) Plaintiff's Claim for Declaratory Relief

A portion of Plaintiff's claim for declaratory relief relies on Plaintiff's other state law causes of action. Accordingly, to the extent that the section 17200 unfair competition claim, trade libel claim, and tortious interference with prospective economic advantage claim are stricken, so too are the related portions of Plaintiff's declaratory relief claim. Accordingly, these portions of the declaratory relief claim are **DISMISSED WITH PREJUDICE.**

### E. DEFENDANT IS ENTITLED TO MANDATORY ATTORNEYS' FEES AND COSTS

■■■■■■ Under section 425.16(c), a defendant who prevails on an anti-SLAPP motion to strike is entitled to recover his or her attorney fees. *Pfeiffer Venice Props. v. Bernard,* 101 Cal.App.4th 211, 216, 123 Cal.Rptr.2d 647 (2002). The statute is broadly construed so as to effectuate the legislative purpose of reimbursing the prevailing defendant for expenses incurred in extricating him or herself from a baseless lawsuit. *Wilkerson,* 99 Cal.App.4th at 446, 121 Cal.Rptr.2d 275. An award is proper even if the anti-SLAPP motion is granted as to only some of a plaintiff's claims. *ComputerXpress,* 93 Cal.App.4th at 1020, 113 Cal.Rptr.2d 625. Accordingly, Defendant is ordered to provide evidence of its costs and attorneys' fees so that the Court may award Defendant its attorneys' fees.

## III.

## DEFENDANT IS ENTITLED TO JUDGMENT ON THE PLEADINGS

Because claims under federal law are not subject to California's anti-SLAPP statute, Defendant moves under FED. R.

CIV. P. 12(c) ("FRCP") to dismiss Plaintiff's single federal claim under the Lanham Act as well as Plaintiff's claim for declaratory relief to the extent it is predicated upon the Lanham Act claim.

### A. LEGAL STANDARD FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP 12(c)

■■■■■■ A motion for judgment on the pleadings, pursuant to FRCP 12(c), is a proper means to challenge the sufficiency of the complaint after an answer has been filed. *See* FED. R. CIV. P. 12(c). FRCP 12(c) is a vehicle for summary adjudication, but the standard is like that of a motion to dismiss. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Dismissal is proper only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim which would entitle him to relief. *Sun Savings & Loan Ass'n v. Dierdorff,* 825 F.2d 187, 191 (9th Cir.1987). In ruling on a motion for judgment on the pleadings, the court must construe the complaint, and resolve all doubts, in the light most favorable to the plaintiff. *General Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church,* 887 F.2d 228, 230 (9th Cir.1989). Although the court must accept all material allegations in the complaint as true, the court need not accept as true conclusory allegations or legal characterizations. *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 810 (9th Cir.1988).

In deciding a motion for judgment on the pleadings, the court generally is limited to the pleadings and may not consider extrinsic evidence. *See* FED. R. CIV. P. 12(c). A district court may, however, consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994). Moreover, a district court may

consider a document if it is "necessarily relied" upon by the complaint, as long as the authenticity of the document is not challenged. *See Parrino v. FHP. Inc.*, 146 F.3d 699, 706 (9th Cir.1998).

### B. PLAINTIFF'S LANHAM ACT CLAIM DOES NOT STATE A CLAIM FOR RELIEF AND PLAINTIFF LACKS STANDING TO BRING SUCH AN ACTION

▇▇▇ Plaintiff now attempts to raise allegations in support of its Lanham Act claim that are not mentioned in the complaint. For example, there is no allegation in the complaint that Plaintiff and Defendant are competitors—a position that is vigorously argued in opposition to Defendant's motion. In fact, New.net's description of the two companies in its complaint is at odds with its current stance that the parties are competitors and makes clear that the parties are engaged in separate and distinct businesses. (Compare Compl. ¶ 9 ("Newdotnet Client software allows users to enable individual computers to access the website names and e-mail addresses that are within the domain namespace that New.Net has launched.") with Compl. ¶ 10 (Lavasoft's software "provide[s] continuous protection from ... aggressive advertising ... tracking components'" and other "'unauthorized program[s].'")). Additionally, Plaintiff's complaint does not allege conduct that is harmful to its ability to effectively compete with Defendant or that it derives revenue from its distribution of NewDotNet to computer users.

### 1. Plaintiff Lacks Standing to Bring Its False Advertising Claim

▇▇▇▇ In order to bring a false advertising claim, the Lanham Act requires that: (1) the plaintiff competes with defendant in some marketplace; (2) the plaintiff has alleged a discernibly competitive injury resulting from the misrepresentation in the marketplace; and (3) the misrepresen-

tation implicates some purpose of the Lanham Act such as the protection of trademarks or unfair competition. *Kournikova v. General Media Communications, Inc.*, 278 F.Supp.2d 1111, 1117 (C.D.Cal. May 2, 2003). For the purposes of the Lanham Act, "competitors" are "persons endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the services better or cheaper than his rival." *Id.* They are parties vying for the same dollars from the same consumer group. *Id.*

Based on Plaintiff's own description of the parties' respective businesses in the complaint, they would not be considered competitors because they are involved in different products in different segments of the internet market. Moreover, the complaint is devoid of any allegation that Plaintiff derives revenue from computer users for the distribution of its software and therefore that it is competing for the same dollars from the same consumers (computer users) who purchase goods from Defendant. Plaintiff now argues that Defendant is a competitor because both parties market their products to internet users who seek an enhanced browsing experience and enhanced functionality. (Opp. at 23). This broad definition would capture almost any company that sells software that has some connection or relationship to the internet. Norton anti-virus and a program which enables internet users to effectively download and file-share pornography would be competitors under Defendant's proposed definition. (See Reply at 15). Lanham Act jurisprudence precludes such a broad definition of "competitor" which, contrary to the Act's expressly stated purpose, would transform it into a "statute of misrepresentation." *Halicki v. United Artists Comms., Inc.*, 812 F.2d 1213, 1214 (9th Cir.1987).[12]

---

**12.** Significantly, Plaintiff itself cites *Halicki* for this proposition. (*See* Opp. at 24.)

In sum, because Defendant's purported misrepresentations do not implicate the purposes of the Lanham Act—protection of trademark or prevention of unfair competition—Plaintiff lacks standing to bring suit under the Lanham Act. *Id.* at 1117–18. Thus, Plaintiff's allegations are insufficient to establish standing to bring suit under the Lanham Act, which alone provides a sufficient basis for dismissal.

## 2. Plaintiff Cannot Prove the Elements of False Advertising

 Plaintiff's complaint fails to sufficiently plead the elements of a false advertising claim under the Lanham Act. False advertising under the Lanham Act occurs when:

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising . . . misrepresents the nature, characteristics [or] qualities . . . of his or her or another person's goods, services, or commercial activities . . . .

15 U.S.C. § 1125(a)(1). Accordingly, the Lanham Act requires, among other things, that the false statements are: (1) commercial speech [as defined by the Lanham Act]; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute advertising within the industry. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003).

 First, the complaint does not allege that Defendant's statements constitute commercial speech. Moreover, the statements about Plaintiff are not commercial speech within the meaning of the Lanham Act. Not unlike the definition of commercial speech for the purposes of a section 17200 claim, under the Lanham Act, "[t]he core notion of commercial speech is 'speech which does no more than propose a commercial transaction.'" *Rice*, 330 F.3d at 1181 (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). Because, as this Court has already ruled, Defendant's speech constitutes speech on an issue of public importance, (11/4/03 Order at 16), it cannot be said that the sole purpose of the speech is to propose a commercial transaction. (*See also id.* at 22 ("New.net can hardly argue that the speech involved in this case is of limited or purely private interest.")).

Courts have acknowledged that the Lanham Act's prohibition against false advertising "has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service." *Wojnarowicz v. American Family Ass'n*, 745 F.Supp. 130, 141 (S.D.N.Y.1990). As the legislative history of section 43(a) of the Lanham Act makes plain, misrepresentations other than false advertising:

> [A]re the type which raise free speech concerns, such as Consumer Reports which reviews and may disparage the quality . . . of products, [and] misrepresentations made by interested groups which may arguably disparage a company and its products . . . [T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer and editorial comment, parodies, satires, or other constitutionally protected material . . . . The section is narrowly drafted to encompass only clearly false and misleading commercial speech.

*Id.* at 142 (quoting S. 1883, 101st Cong., 1st Sess., 135 Cong. Rec. 1207, 1217 (Apr.

13, 1989)). Precisely the same rationale applies to Defendant.

Defendant functions like various consumer protection groups in that it gathers publicly-available information about various software products and then discloses that information to the general public so that the public can intelligently and independently decide whether they want various software to remain on their computer. If the law were otherwise, then every statement by one entity concerning another's product that is alleged to be false would be the subject of a Lanham Act claim. Moreover, even though many product evaluation magazines and newsletters (*e.g.*, Consumer Reports) charge for their publication, their statements about the products of others cannot be described as speech that proposes a commercial transaction. Accordingly, such statements cannot reasonably be characterized as "advertising" the sale of its magazine as that term is interpreted in the context of Lanham Act jurisprudence. *Rice*, 330 F.3d at 1181. Accordingly, based on the pleading, the Lanham Act false advertising claim fails as a matter of law.

Second, as discussed *supra*, Plaintiff's complaint does not, and indeed, cannot allege that Defendant is one of its competitors. Third, Plaintiff has not adequately alleged, and as a matter of law, cannot allege, that the reference to Plaintiff in its software was "for the purpose of influencing consumers to buy Defendant's goods or services," *id.*, because the statements about NewDotNet appear only after Ad-aware has been downloaded and the scan has been run on the user's hard drive. *See also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997) (holding that in order to prevail on Lanham Act false advertising claims, the plaintiff must show that "such deception is material, in that it is likely to influence the purchasing decision" of the consumer). Moreover, there is no purchase here be-

cause Ad-aware is available for free to the general public and its enhanced versions, which are available for sale, are virtually identical to the free version in all respects relevant to Plaintiff's claim. (11/4/03 Order at 7 n. 4). Because the statements are made after the goods are delivered, and there is typically no "purchase," Defendant's statements are not and cannot be alleged to be "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' ... within that industry." *Rice*, 330 F.3d at 1181.

Because Plaintiff does not plead, and indeed, cannot plead the elements of a false advertising claim under the Lanham Act, the Court **DISMISSES** the claim **WITH PREJUDICE**.

### C. PLAINTIFF'S CLAIM FOR DECLARATORY RELIEF IS ALSO DISMISSED

The Court **DISMISSES** the portions of Plaintiff's claim for declaratory relief claim that rely on the Lanham Act claim.

## IV.

## CONCLUSION

For the foregoing reasons, each of Plaintiff's state law claims are **STRICKEN** pursuant to California's anti-SLAPP statute. Furthermore, Defendant is entitled to a judgment on the pleadings with regard to Plaintiff's Lanham Act claim. Because Plaintiff does not and cannot sufficiently plead the elements of its Lanham Act claim, the claim is **DISMISSED WITH PREJUDICE**. Moreover, because Plaintiff's claim for declaratory relief is wholly reliant on its state law claims and federal Lanham Act claim, it too is **STRICKEN** or **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED.